**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC, d/b/a BRAZOS LICENSING AND DEVELOPMENT<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Civil Action No. 6:20-cv-00456<br>Civil Action No. 6:20-cv-00458 |

**<u>DEFENDANT'S RESPONSIVE MARKMAN BRIEF</u>**

# TABLE OF CONTENTS

I.    THE '868 CLAIM TERMS ....................................................................... 1

  A.   The Problem To Be Solved By The '868 Patent...................................... 1

  B.   Agreed Terms........................................................................................ 2

     1. "emergency call muter" (Claim 12) ................................................. 2

     2. "[origination / originating] station" (Claims 1 and 18)................... 3

     3. "terminating station" (Claim 18) ..................................................... 3

  C.   Disputed Terms..................................................................................... 3

     1. "access gateway" (Claims 1 and 18).............................................. 3

     2. "emergency call router" (Claim 1 and 18)...................................... 7

     3. "target gateway" (Claims 1 and 18)............................................. 10

     4. "selectably operable" (Claims 1 and 13) and "selectably routing"
       (Claim 18) .................................................................................... 11

     5. "the apparatus of claim 1 wherein the communication system
       further comprises a local-network alternate station, wherein said
       emergency call muter is further for determining whether the call
       of the selected call-type shall be completable by way of the
       normal-operation communication link and for rerouting a call
       request to the local-network alternate station upon determination
       that the call completion by way of the normal-operation
       communication link" (Claim 12) ................................................ 14

II.   THE '550 CLAIM TERMS ................................................................. 15

  A.   The Problem To Be Solved By The '550 Patent................................... 15

  B.   The Means Terms Are Subject to § 112, ¶ 6...................................... 16

     1. means for defining access rules for each of said presence
       contributors, said access rules associated with each of said
       presence contributors defining respective rights and privileges of
       said presence contributors to access said presence information of
       sad presently after said presence contributors have provided said
       presence information to said presence server (Claim 1)............................. 19

     2. means for authenticating one of said presence contributors to
       determine said access rules associated with said one of said
       presence contributors (Claim 1)................................................... 22

     3. means for enabling access to said presence information of said
       presently by said one of said presence contributors based on said
       access rules associated with said one of said presence
       contributors (Claim 1).................................................................. 23

     4. means for enabling access further includes means for filtering
       said presence information of said presently based on said access

i

rules of said one of said presence contributors to produce filtered presence information and means for providing said filtered presence information to said one of said presence contributors (Claim 1) .................................................................................................. 25

5. means for enabling access further includes means for enabling said one of said presence contributors to update said presence information of said presentity based on said access rules of said one of said presence contributors (Claim 1) ................................ 29

6. means for enabling access further includes means for enabling said one of said presence contributors to define preference information associated with said presence information of said presentity based on said access rules of said one of said presence contributors (Claim 1) ................................................................................ 31

7. means for authenticating further includes means for assigning authentication credentials to each of said presence contributors and means for receiving said authentication credentials of said one of said presence contributors to authenticate said one of said presence contributors (Claim 4) .............................................................. 34

8. means for enabling further includes means for enabling access to said presence information of said presentity by multiple ones of said presence contributors simultaneously based on said respective access rules associated with said multiple ones of said presence contributors (Claim 6) .............................................................. 38

C. Other Disputed Terms ........................................................................................ 40

1. "presentity" / "presentities" (Claims 1, 8 and 11) and "presence contributor" (Claims 1, 8, and 11) .................................................................. 40

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*,
    811 F. 3d 1334 (Fed. Cir. 2016) ................................................................ 12

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) ................................................................ 18

*Augme Techs., Inc. v. Yahoo! Inc.*,
    755 F.3d 1326 (Fed. Cir. 2014) ................................................................ 18

*B. Braun Med., Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997) ................................................................ 17

*Blackboard, Inc v. Desire2Learn, Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009) ................................................ 22, 27, 28, 30

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012) ................................................ 21, 23, 25, 27

*Finisar Corp. v. DirecTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ........................................................*passim*

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ................................................................ 15

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) ................................................ 35, 37, 38

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ................................................................................ 42

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120, 2129 (2014) ............................................................ 14, 15

*Personalized Media v. ITC*,
    161 F.3d 696 (Fed. Cir. 1998) ................................................................ 16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................ 9, 42

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    574 U.S. 318 (2015) .................................................................................. 3

*Triton Tech of Texas, LLC v. Nintendo of America, Inc.*,
    753 F.3d 1375 (Fed. Cir. 2014)......................................................................18

*Williamson v. Citrix Online*,
    792 F.3d 1339 (Fed. Cir. 2015)......................................................16, 17, 18

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)....................................................................17

## Statutes

35 U.S.C. § 112 ¶ 6....................................................................*passim*

Microsoft submits this brief in response to WSOU's Opening Claim Construction Brief (Dkt. 46), addressing terms of U.S. Patent No. 7,388,868 ("the '868 patent") and 7,676,550 ("the '550 patent"), which are asserted against Microsoft Skype for Business.[1]

## I.  THE '868 CLAIM TERMS

### A.  The Problem To Be Solved By The '868 Patent

The '868 Patent (EX. 1) seeks to solve the problem of how to handle call routing in a communications network when that the normal communication link fails. EX. 1 at 3:13-20.  The '868 Patent describes a communications system that includes an access gateway connected via a communication link to a central controller, also known as a "soft switch," in a packet data network.  *See id*. at Abstract; *see also*, *Id*. at 5:51-55 and Fig. 1.  That softswitch controls the system as a whole. *Id*. at 2:41-47; *see also*, *id*. at 6:44-48.  During normal operation, the softswitch handles routing of calls to their targets via the communication link. *Id*. at 6:52-54. Sometimes, however, that communication link fails. *Id*. at 2:57-3:4.  That emergency situation requires a back-up mechanism for calls to continue to be routed. *Id*. at Abstract; *see also*, *Id*. at 3:41-44

The '868 patent's solution employs an emergency call router that becomes operable, replacing the softswitch to provide call routing for the devices at the affected site. *See Id*. at Abstract; 1:14-19; 3:41-44; 7:10-17; 9:15-20.  Figure 1 of the patent illustrates such a system:

---

[1] Emphases are added throughout, unless otherwise indicated.



**FIG. 1**

In this annotated figure, the softswitch is highlighted in pink, the packet data network is highlighted in green, and various access gateways are highlighted in purple. The communication link failure is shown highlighted in blue, and the emergency call router is highlighted in yellow.

However, limitations in this system force the emergency call router to prioritize and select which calls should be completed. It prioritizes based on call type and priority information, then routes the calls accordingly. *Id*. at 7:41-56; see also, *id*. at 8:23-62.  For example, the '868 patent teaches that calls to emergency services (such as a 9-1-1 call) may be considered to be of the highest priority, meriting preemption of other calls. *Id*. at 8:29-31.

**B.    Agreed Terms**

   **1.    "emergency call muter" (Claim 12)**

The parties agree that the term should be construed as "emergency call router" to correct an error made by the Patent Office.

### 2.    "[origination / originating] station" (Claims 1 and 18)

The parties agree that these terms do not require construction and should be understood to have their plain and ordinary meaning.

### 3.    "terminating station" (Claim 18)

Microsoft does not believe that this term, which WSOU proposed to construe, requires construction. WSOU has not included this term in its opening claim construction brief. Thus, the parties appear to agree that this term does not require construction.

### C.    Disputed Terms

### 1.    "access gateway" (Claims 1 and 18)

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| gateway coupled to the packet data network for communication with a softswitch | Plain and ordinary meaning |

The communication system of the '868 patent invokes various gateways as part of its fundamental infrastructure.  The "access gateway" is one.  Though WSOU argues that the term requires no construction and should be given its plain and ordinary meaning, that simply begs the question of what that plain and ordinary meaning is. It is not sufficient to claim, as WSOU does, that "gateway" is a term of art and that "access" is a qualifier that is readily understood in light of the surrounding claim language and the corresponding written description.[2] *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015).  The jury will be left to guess what an "access gateway" (as opposed to some other gateway) is.  More than a generic qualifier, "access" here defines a particular gateway that *defines* the network device on which the claimed invention can preserve call routing— the local network left isolated by the communication link failure.

---

[2] WSOU cannot fairly dispute that the specification defines "gateways" as "[d]evices [that] form gateways to the packet data network." *Id.* at 2:26-29.

By contrast, Microsoft's proposed construction explains exactly what an "access gateway" is and how it fits into the claimed communication system, as the specification describes. Microsoft's construction comports with the purpose of the invention, which is to enable local calls to continue to be made within a part of a local network defined by that access gateway (as shown above) when link failure isolates the access gateway from the softswitch (*i.e.*, the communication system controller), which is the device that normally provides call control for the communication network.

The term "access gateway" first appears in claim 1 as "*the* access gateway."  The emergency call router is connected to it.  The claim provides no explanation as to what the access gateway is or its function. Dependent claims 2, 3, 4, 6, 7, 11, and 13, all of which ultimately depend from claim 1, all recite "an access gateway" or "a first access gateway" to which the communication network, a "local-network alternate station," or a "local network," is connected. These recitations raise more questions.  The claim language does not make clear whether these are the same "access gateway" recited in claim 1, or different access gateways. Independent claim 18 introduces yet another "a first access gateway," described simply as connected to the emergency call router.  None of the claims tell or show the jury what, exactly, the "access gateway" is or what it does.  At most, some identify where it must be – connected to a network.

The specification, however, defines gateways as Microsoft does: By their nature.  They are coupled, and provide access from local networks, to the packet data network:

> Such a new-generation telephonic network generally includes a packet data network, or fabric, through which packet-switched channels are formed. ***Devices referred to as gateways are coupled to the packet data network***. Devices referred to as gateways ***form gateways to the packet data network***. Gateways ***are operable, amongst other things, to form gateways to the packet data network from local networks***.

EX. 1 at 2:24-31. . *See also, e.g., id.* at 6:9-15 ("***The gateways are associated with local***

***networks 22*** at which individual telephonic stations 24 are positioned. ***The gateways to which***

***the local networks are connected from the <u>access</u> mechanism through which the telephonic***

***stations are connected to the packet data network*** and through which all calls originated at, or to

be terminated at, the telephonic stations of a particular local network are routed.")  Further,

access gateways are coupled to the packet data network via communication links:

> A plurality of gateways, here ***access gateways (AGWs) 16 are coupled to the***
> ***packet data network***. Here, four exemplary gateways, gateways 16-1, 16-2, 16-3,
> and 16-4, are shown to be ***directly connected to the packet data network, here***
> ***represented by way of communication links 18***.

*Id*. at 5:51-55.

Those communication links extend from the access gateway to the softswitch that

controls the operations of the system. *See e.g.*, *id*. at 1:11-19 ("The call handling is provided at a

local network associated with an access gateway upon total failure of a ***communication link***

***between the access gateway and a softswitch which controls operations of the system***."); *Id*. at

3:52-55; 4:53-57 ("in spite of the total failure of the communication link between the access

gateway and the softswitch, local call control functionality is provided to permit at least limited

communication in the local network associated with the access gateway."); *Id*. at Fig. 1; and Fig.

3; *see also*, *Id*. at Abstract ("Emergency call-routing ***apparatus, and an associated method, for***

***use in a packet-based, telephonic network***. An emergency call router is positioned selectably to

provide local call handling functionality to a local network that is ***normally connected by way of***

***an access gateway to the telephonic network whose operation is normally controlled by a***

*softswitch*. The apparatus is used when, *e.g.*, a total **communication link failure condition occurs between the access gateway and the softswitch**.").[3]

Figure 1 repeatedly and consistently illustrates this relationship: Numerous access gateways (16-x) are associated with respective local networks (22-x), access gateways are connected to the packet data network 14 via respective communication links (18-x), and a softswitch 34 ordinarily provides call control for the entire system 10. If a communication link is disrupted 44, the emergency call router 48 kicks in to allow rudimentary calling functions on the associated local network 22.

Thus, Microsoft's proposed construction defines the "access gateway" precisely as set forth in the patent as a gateway coupled to the packet data network for communication with a softswitch.

WSOU objects to the inclusion of "packet data network" in Microsoft's proposed construction as overly narrow, but the specification is unambiguous—the only relevant communication network is a packet based network, as opposed to any possible legacy telephonic communication network. Indeed, the specification specifically notes that it describes an **apparatus, and an associated method, for use in a packet-based, telephonic network**" (*Id.* at Abstract), and that "[i]t is in light of this background information related to **packet-based, telephonic communication systems** that the significant improvements of the present invention have evolved." *Id.* at 3:21-24. Further, the specification repeatedly refers to the communication network as a packet data network, packet based network, or similar terminology. *See id.* at

---

[3] Though the word "softswitch" does not appear in the claims, the term "communication system controller" does, and the language of claim 1 reinforces that the communication system controller controls the communication system in normal operation. The softswitch, as described in the cited portions of the specification herein, likewise controls the communication system in normal operation. Microsoft's construction could be readily amended to swap "communication system controller" for "softswitch."

Abstract; 5:18-20; 5:42- 61; 6:4-8; 6:9-15; 6:30. Moreover, the patent aims to address an issue particular to "next-generation telephonic communication systems" that, unlike legacy circuit-switched networks, use packet-based communications and utilize softswitches for their operation. *See id.* at 2:18-23; 2:57-3:12.  There is no basis for WSOU's objection in view of the intrinsic evidence.

### 2.    "emergency call router" (Claim 1 and 18)

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| back-up call router that is operable only when the communication link fails | Plain and ordinary meaning |

As described above, the "emergency call router" is the core of the alleged invention. Indeed, in describing its invention, the '868 patent includes an "emergency call router … that is operable upon detection of occurrence of the failure of the communication link" "between the access gateway and a softswitch which controls operations of the system." *Id.* at 1:8-17. The term "emergency call router" thus refers to a particular router in the system of the '868 patent that performs a very specific function within the larger communication system: operating as a back-up router to provide local call handling when total failure of the normal communication link occurs.

Claim 1, which is in *Jepson* format, tracks this description of the invention: the improvement is "facilitating call completion…*subsequent to failure* of the normal-operation communication link." *Id.* at 10:14-17; *see* 37 C.F.R. 1.75(e) (describing the *Jepson* claim format). That improvement, as the claim details, is carried out by an emergency call router "selectably operable *responsive to failure* of the normal-operation communication link." *Id.* at 10:19-21.

The specification consistently and clearly explains that the emergency call router is exactly as Microsoft has proposed.

> ***An emergency call router*** is positioned selectably to provide local call handling functionality to a local network that is normally connected by way of an access gateway to the telephonic network whose operation is normally controlled by a softswitch. ***The apparatus is used when, e.g., a total communication link failure condition occurs between the access gateway and the softswitch***.

*Id*. at Abstract; *see also*, *Id*. 3:41-44 ("Through operation of an embodiment of the present invention, local call handling at a portion of the communication system associated with an access gateway is provided ***subsequent to total failure of a communication link*** … ***Local calling*** between telephonic station associated with the access gateway ***is provided by way of an emergency call router in substitution for the softswitch*** that normally would otherwise control calling functions").

The specification also repeatedly states that the "emergency call router" is called into service *only* when the normal communication link has failed. Otherwise, the emergency call router remains dormant.

> An emergency call router is provided that is ***operable upon detection of occurrence of the failure of the communication link***. The call router provides at least selected, rudimentary local handling functions that otherwise would not be permitted due to the failure of the communication link.

*Id*. at 1:14-19; *see id.* at 1:60-63 ("***When*** the detector detects the ***failure of the communication link, the emergency call router <u>becomes operational</u>***…"); *id.* at 5:5-9 ("The emergency call router <u>***selectably operates***</u> ***responsive to failure of the normal-operation communication link***…"); *Id*. at 9:15-20 ("***When a communication link extending beyond the access gateway fails***, detection is made of the failure by the detector 42 of the access gateway and an indication is provided, indicated by the segment 74, to the emergency call router. ***The emergency call***

*router __becomes operable__ responsive thereto*.").  There is no description of the emergency call router becoming operable unless the communication link fails.

WSOU's argument misses the point of the patent.  "Router" may be a term of art, but "emergency call" as used in the patent is not confined to emergency calls in the common sense. Claim terms must be understood in the context of the invention, but WSOU's breaking up this claim term to imply that the "emergency call router" is whatever connects "emergency calls" (*e.g.*, a 9-1-1 call in the U.S) conflicts with the scope described in the '868 patent. *See Phillips v. AWH Corp*., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (internal citations and quotations omitted). The specification describes a broader functionality. *See Id*. at 4:31-39 (explaining that the emergency call router may be operable to route different call types including "emergency calls, such as calls that are placed to the public service access point, calls placed to published lower-digit, such as three digit, service centers, calls placed to from priority parties, and finally, low-priority, local calls.").

Similarly, the relevant claim language undermines WSOU's argument that Microsoft's proposed construction conflicts with dependent claim 7, which recites "said emergency call router further comprises a call priority determiner operable at least responsive to failure of the normal-operation communication link."  This limitation relates to the operation of a "call priority determiner" not to the "emergency call router.   The plain wording of these claims, thus, provides for the "emergency call router" to be operable only when the communication link fails, while the call priority determiner component is operable at least when the communication link fails.

 Microsoft's proposed definition, which is consistent with the patent's overall context and aligns with its disclosure provides clear and accurate guidance as to the proper scope of this term.

### 3.     "target gateway" (Claims 1 and 18)

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| gateway coupled to the emergency call router and separate from the access gateway | Plain and ordinary meaning |

The core dispute here is whether "target gateway" and "access gateway" can properly be construed to mean the same gateway. Microsoft's proposal enforces this common sense distinction. The term "target gateway" does not appear in the '868 patent specification, just in the claims. WSOU's argument that a "gateway" is a term of art and that "target" is a qualifier that is readily understood in light of the surrounding claim language and the corresponding written description thus immediately falls flat.

Both claim 1 and claim 18 recite an "access gateway" and a "target gateway," These distinct gateways provide necessary orientation to the operation of the "emergency call router" recited in the claims, which has the purpose of allowing a call to be routed from one point to another. Claim 1 specifies that each is coupled to the emergency call router. Similarly, Claim 18 recites "a first access gateway" and "a target gateway" with an emergency call router connected therebetween. The claim language alone requires the term "target gateway" must refer to a gateway separate from the "access gateway," while still being coupled or connected to the emergency call router. Indeed, it would be nonsensical for the access gateway and the target gateway to refer to the *same* gateway, when the emergency call router must be connected **between** the access gateway and the target gateway. *See* Claim 18 ("connecting the emergency call router, as a preliminary operation, between at least a first access gateway and a target gateway of the communication system").

This illogical result, however, is exactly what WSOU suggests, arguing that the target gateway need not be separate from the access gateway. In support, WSOU points to two

dependent claims that specifically state that the emergency call router may be embodied *at* the access gateway. This is simply irrelevant to the issue at hand. No claims say that the target gateway and access gateway are combined.  At most, claims 2 and 3 place other devices with the emergency call router or access gateway.

In the only discussion of the "target gateway" during prosecution, the applicant argued that the inclusion of  "***a target gateway coupled to the emergency call router***" in claim 1 and "connecting the emergency call router, as a preliminary operation, ***between at least a first access gateway and a target gateway*** of the communication system;" in claim 18 made the claims allowable because these limitations were originally presented in claim 19 and were found to be allowable.  EX. 4.  Original claim 19 states, in relevant part, that "the communication system further comprises ***at least a first access gateway and a target gateway*** and wherein said method further comprises the preliminary operation of ***connecting the emergency call router between the access gateway and the target gateway***." EX. 5.  Neither of these passages state or suggest that the access gateway and the target gateway are or could be the same gateway. Rather, this is consistent with the claim language and Microsoft's proposed construction that the target gateway of claim 1 and claim 18 is different and separate from the access gateway.

### 4.     "selectably operable" (Claims 1 and 13) and "selectably routing" (Claim 18)

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| selectably operable : deciding whether to permit a call to be routed based on call-type or call priority<br><br>selectably routing : deciding whether to permit a call to be routed based on call-type or call priority | Plain and ordinary meaning |

The dispute here is whether claim terms using the contrived term "selectably" require construction.  Because these phrases go to a critical part of the claimed invention, namely the routing of some calls but not others, Microsoft's proposal should be adopted.

WSOU makes no effort to show that "selectably" comes from the normal English lexicon, although, at the very least, it is a conspicuous adverbial construct of "selectable."  In the claims, it modifies operations of the emergency call router that go to the core of the purported invention for  providing "selected, rudimentary local handling functions," such as the routing of priority calls or selected lower-priority calls, in the event of a communication link failure. EX. 1 at 1:17-25. Claims 1 and 13 recite an emergency call router "*selectably* operable. . . for routing," and claim 18 recites the step of "*selectably* routing a call request . . . by way of an emergency call router."  The same construction, thus, applies for all these claims.

At the outset, Microsoft's proposal, by referencing routing based on "call-type or call priority" does not seek to constrict the claim scope, but simply aligns with the breadth of the specification.  The patent generally describes call priority as a call-type, but suggests priority may be its own call routing criteria. *See*, *e.g.*, *Id*. at 4:35-39 (listing "calls placed to from priority parties" and "low-priority, local calls" as examples of "call-types"); *Id*. at 4:39-41 (describing "[a]dditional listings prioritizing calls placed upon the identifies of the calling parties").

Although the claims use the contrived word "selectably" in defining operation of the emergency call router that is the core of the patented invention, WSOU insists that these terms require no construction. WSOU appears to argue that, because the claims elsewhere recite "determines" or "determining," no further construction is needed. But WSOU's position impermissibly renders the word "selectably" superfluous, and its interpretation should be rejected. *See Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*, 811 F. 3d 1334, 1340 (Fed. Cir.

2016) (citing *Merck & Co. v. Teva Pharm. USA, Inc.,* 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so). As described, a fundamental concept of the '868 patent is that an emergency call router begins to operate upon failure of the normal-operation communication link, stepping in to select which call types should be completed and route calls of the select type based on priority. EX. 1 at 7:61-64. But, the emergency call router, as claimed, does not simply route all the calls that come its way without other considerations. In the claims, as set forth in the preamble, the system is only designed to pass certain types of call. Recognition of such calls therefor is necessary for the intended operation and comes from the "determining" step (on which WSOU focues). Determining whether the call is of the "selected call-type" and *may* be routed is fundamental, but the "selctably" claim language reflects the specification's description that whether any given call that may be routed is actually routed rests ultimately with the emergency call router.

> By providing the local call handling functionality to the local network, calls placed between telephonic stations of the local network are at least ***selectably completable. Selection of which calls are completed <u>as well as</u> routing of certain priority calls to designated, local network telephonic stations is dependent, e.g., upon the call-type of the call being placed.*** Higher-priority calls are permitted to be completed prior to lower-priority calls. Call-types include, for instance, local calls, long distance calls, *e.g.*, local toll calls, intra-state calls, inter-state calls, international calls, toll-free calls, operator calls, collect calls, and emergency calls. Upon failure of the communication link, many of such calls are no longer able to be completed"

EX. 1 at 7:44-56; *see also*, *id*. at 8:46-52 (describing that the emergency call router includes a priority detector that "***selectably routes the call or prevents routing of the call, depending upon the calling capacity within the local network and the priority level of the call***. If a high-priority call is placed and capacity is not otherwise available***, a lower-priority call is terminated by the emergency call router to permit the higher-priority call to be completed***.").

Microsoft's construction is consistent with the claims and the specification, and, unlike WSOU's "plain and ordinary" meaning, the proposed construction gives meaning to all terms of the claim.  Microsoft's construction should be adopted.

> **5.** **"the apparatus of claim 1 wherein the communication system further comprises a local-network alternate station, wherein said emergency call muter is further for determining whether the call of the selected call-type shall be completable by way of the normal-operation communication link and for rerouting a call request to the local-network alternate station upon determination that the call completion by way of the normal-operation communication link" (Claim 12)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning; not indefinite. |

Claim 12 is missing words. Without those words at the end of the claim, the reader must speculate as to what determination must be made before a call is rerouted to the local network alternate station. There is no possible "plain and ordinary meaning" in these circumstances. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

Specifically, the claim first recites that "said emergency call muter is further for determining whether the call of the selected call-type shall be completable by way of the normal-operation communication link."  Then it goes on to recite that said emergency call router is also for "rerouting a call request to the local-network alternate station upon" a particular determination, specifically, "determination *that the call completion by way of the normal-operation communication link*." This language does not provide a criteria for any determination.  Instead, because the claim is missing words to complete the sentence, the claim requires speculation as to what is missing.

Does the claim intend to state that the emergency call router is for rerouting a call request to the local network alternate station when call completion by way of the normal-operation

communication link has succeeded? Or perhaps when it has failed? Or under some other set of

circumstances? Because the claim requires speculation at least as to the conditions on which the

required determination is made, the claim phrase is indefinite as it fails to inform those skilled in

the art, with reasonable certainty, about the scope of the invention.  The public is entitled to

know what behavior is infringing and what behavior is not, and there is simply no way to know

based on the words of this claim.  *Interval Licensing LLC v. AOL, Inc*., 766 F.3d 1364, 1373

(Fed. Cir. 2014).

       WSOU's suggestion that the term "call completion" itself would be understood to be an

event condition does not clarify the criteria upon which the determination that must be made.  At

most, a person of ordinary skill might understand that before rerouting the call to the alternate

station a determination is being made as to the nature of call completion via the normal

communication link, but without more, he or she would be left to speculate as to what condition

triggers rerouting.  Without such information, the scope of the claim 12 is indecipherable. Thus,

the claim does not provide clear notice to one of ordinary skill in the art of what is claimed and

should be held to be indefinite.  *See Nautilus*, 134 S. Ct. at 2129.

## II.      THE '550 CLAIM TERMS

### A.      The Problem To Be Solved By The '550 Patent

       The '550 patent (EX. 2) relates to presence-based interactive communication systems. It

arises in the context of systems for providing information about the presence (*i.e*., availability

and current status) of various entities, such as users, services, devices, and/or facilities, on a

network. That presence information can then be used to inform real-time communication

sessions with the entities. *See id.* at 1:10-18. These conventional systems also allowed for an

assistant or similar entity to access or change the presence information of another entity.

According to the patent, however, there were situations where it was desirable to limit the access

privileges of such "presence contributors," such that they might be able to access and/or update only one part of the presence information but not another. *See id.* at 1:38-51.

The '550 patent claims to have solved this need through a system with a "multiple access presence agent for use in a presence server" that is used to ascertain and distribute the presence status of a user. It describes that the user may be accessing the system through more than one endpoint. The system also includes "presence contributors," who can provide updates regarding a user's current presence and also access their presence status. The presence agent authenticates presence contributors using login credentials and allows users to define access rules for each presence contributor, such that certain privileges or information about presence are available only if the presence contributor has been permitted access. *See id.* at 1:55-2:2. The presence contributor might be a user, a group of users, an application, a device, or a facility. The presence information that is provided may be for a user, group of users, application, device, or facility, as the system desires. *Id.* at 2:2-6.

### B.      The Means Terms Are Subject to § 112, ¶ 6

Claim 1, 4, and 6 recite eight different limitations that use "means for" language. In fact, every claim limitation, outside of the preamble, is a "means for" limitation that requires software to be performed. The presence of the word 'means' has long been recognized by the Federal Circuit as important "[t]o determine whether § 112, para. 6 applies to a claim limitation." *Williamson v. Citrix Online*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  Because each term uses the word "means," there is a rebuttable presumption that § 112, ¶ 6 applies.  *Personalized Media v. ITC*, 161 F.3d 696, 703-4 (Fed. Cir. 1998). Under § 112, ¶ 6, the "scope of coverage" of the term is restricted "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). Moreover, only those disclosed structures *clearly*

16

*linked* to the claimed function qualify as corresponding structure under the statute. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997).

WSOU nonetheless argues that the claim recites sufficient structure to overcome the strong presumption that § 112, ¶ 6 applies.  Specifically, WSOU argues that the recital of "[a] multiple access presence agent for use in a presence server" in the preamble of the independent claim is sufficient to overcome this presumption, based on *TecSec, Inc. v. Int'l Bus. Machs. Corp.* in which the Court determined that for the specific claims at issue in that case, "[a] 'system memory' is sufficient structure to perform the 'storing data' function."  731 F.3d 1336, 1347 (Fed. Cir. 2013).  But WSOU's reliance on *TecSec* is not reasonable in view of the law and the language of WSOU's claims. Even under *TecSec* the inquiry remains sharply focused on "whether the claim recites sufficient structure *to perform 'the functions in question*.'" *Id*. at 1348 (citing *TriMed, Inc. v. Stryker Corp*., 514 F.3d 1256, (Fed. Cir. 2008)). Unlike the claim at issue in *TecSec*, the claims at issue recite a multiple access agent *further comprising* eleven different means, each with specific and detailed functions.  A person of ordinary skill in the art would not understand a "multiple access presence agent for use in a presence server" alone to be sufficient structure to perform all of the claimed functions. Unlike in *TecSec*, where the system memory was closely and clearly tied to the function of storing data, in the '550 patent claims there is no readily ascertainable connection between what a "multiple access presence agent" does and the required functions of all the different means terms. Nor does WSOU provide any explanation.

Relying on claim 1 preamble language alone also ignores the well-established law that the corresponding structure for a function performed by software is an algorithm.  See *WMS Gaming, Inc. v. Int'l Game Tech*., 184 F.3d 1339, 1348-49 (Fed. Cir. 1999).  Not even WSOU contends that the "multiple access presence agent" preamble language provides any algorithm.

Here, each and every means term includes computer-implemented functions that must be performed in software.  The claims (1, 4, and 6) in which these terms are found are all directed to a multiple access presence agent *for use in a presence server*, *i.e.*, a computer.

In a means-plus-function claim like these in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, "the disclosed structure is not the general purpose computer, but rather the special purpose computer *programmed to perform the disclosed algorithm*." *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  The specification must express the algorithm in "understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citation omitted).  Simply disclosing software, however, "without providing some detail about the means to accomplish the function[,] is not enough." *Id*. at 1340–41 (citation omitted). That is no different from disclosing "a black box that performs the recited function," which "is not a sufficient explanation of the algorithm required to render the means-plus-function term definite." *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1338 (Fed. Cir. 2014). It is also insufficient to merely restate the claimed function without identifying how values are calculated, combined, or weighted. *Triton Tech of Texas, LLC v. Nintendo of America, Inc.*, 753 F.3d 1375, 1379 (Fed. Cir. 2014).  The algorithm for *performing* the claimed function must be identified, not just the functions themselves. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352-53 (Fed. Cir. 2015) (en banc). Thus, these terms are all subject to the requirements of § 112, ¶ 6, and their function and corresponding algorithm must be identified. Otherwise, they are indefinite.

1. **means for defining access rules for each of said presence contributors, said access rules associated with each of said presence contributors defining respective rights and privileges of said presence contributors to access said presence information of said presentity after said presence contributors have provided said presence information to said presence server (Claim 1)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| **Function**: defining access rules for each of said presence contributors, said access rules associated with each of said presence contributors defining respective rights and privileges of said presence contributors to access said presence information of said presentity after said presence contributors have provided said presence information to said presence server.<br><br>**Structure**: presentity 110 along with presence server 160 and presence agent 150<br><br>**Algorithm**: Not Disclosed<br><br>Term is Indefinite | Plain and ordinary meaning, not subject to 35 U.S.C. § 112 ¶ 6.<br><br>But if the Court deems this term is subject to 35 U.S.C. § 112 ¶ 6:<br><br>**Function**: defining access rules for each of said presence contributors<br><br>**Structure**: multiple access presence agent with presence server, and equivalents thereof<br><br>Furthermore, if the Court deems disclosure of an algorithm is required:<br><br>**Algorithm**: define respective rights and privileges of presence contributors to access the presence information of a presentity |

As discussed above, this term is subject to 35 U.S.C. § 112 ¶ 6 and is directed to a computer-implemented function to be performed in software, requiring disclosure of an algorithm for performing the function.

The parties initially dispute the function of this means term. WSOU's proposal improperly reduces the function in a way that would remove limitations critical to the allowance of the claims.  See EX. 3 at 6 ("Claims 1-3, 7-13, 16 and 20-22 are allowed because the prior art did not teach or reasonably suggest ***defining access rules that define rights and privileges of the presence contributor to access the presence information after said presence contributors have provided said presence information to said presence server***").  To gain allowance, the nature of the access rules that this means term must define was critical, yet WSOU would omits that from the function, and thereby write it out of the claim for purposes of assessing infringement or

comparing this claim element to the prior art.  By contrast, the function identified by Microsoft is a verbatim recitation of the function explicitly recited in the claim, and does not seek to omit critical portions of the claim element, as is proper.

The parties do agree that both the presence agent and presence server are part of the required structure. Thus, the central disagreement between the parties relates to the need for presentity 110 to be included to perform the recited function and the lack of algorithm disclosing how the structural elements perform the recited function.

The specification describes that the presentity works in conjunction with the presence agent and presence server to perform this function.  In every embodiment, the presentity 110, or an equivalent, establishes access rules working with the presence agent. *See, e.g.,* 6:62-65 ("***the presentity 110 establishes access rules*** and authentication credentials for both presence contributor A and presence contributor B ***with the presence agent 150 associated with the presentity 110***"); 7:35-44 ("***the presentity 110 establishes access rules*** and authentication credentials for a presence contributor 120 ***with the presence agent 150 associated with the presentity 110***"). Further, in the only discussion of the multiple access presence agent defining access rules, the specification states that the access rules are originally defined by the presentity and then stored in the presence agent. 5:48-61 ("***Each access rule 210 may be originally defined by the presentity***, an administrator of the presence system or other user, ***and stored in the multiple access presence agents 150a and 150b***.").  The specification thus requires a presentity to establish the access rules and a presence agent and presence server to store the defined rules.

WSOU nonetheless argues that the only structure necessary for the recited function is the multiple presence access agent and the presence server. It points to no relevant specification content in support, instead citing a generic recitation in the summary of the invention that the

20

multiple access presence agent is configured to define access rules for each of the presence contributors (1:60-63), and several instances in which the specification describes what an access rule is (5:62-6:1, 6:65-7:3, 7:38-41, 8:36-39). But none of these citations refutes the need for "presentity 110" to be part of the structure performing the function.

The specification must also disclose an algorithm performed by that structure that explains how to carry out the computer-implemented operations that provide the claimed function. Here, there is none, and WSOU cannot identify any such algorithm. The best that WSOU can do is point to language that does no more than explain what "access rules" are, and craft that into an alleged algorithm. Dkt. 46 at 15. WSOU also points to the same disparate portions of the specification it attempted to rely on to support its structure, but functional statements (such as stating that the multiple access presence agent is configured to define access rules for each of the presence contributors, 1:60-63) and definitions (such as descriptions of what an access rule may be, 5:62-6:1, 6:65-7:3, 7:38-41, 8:36-39, and Figs. 3 and 4), are not algorithms. None provides any textual, flow chart, mathematical formula, or other description of an algorithm for how to "define access rules for each of said presence contributors, said access rules associated with each of said presence contributors defining respective rights and privileges of said presence contributors to access said presence information of said presentity after said presence contributors have provided said presence information to said presence server." *Finisar*, 523 F.3d at 1340-41. Without such an algorithm, the means term is indefinite. *Ergo Licensing*, 673 F.3d at 1363.

2. **means for authenticating one of said presence contributors to determine said access rules associated with said one of said presence contributors (Claim 1)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
| --- | --- |
| **Function**: authenticating one of said presence contributors to determine said access rules associated with said one of said presence contributors<br><br>**Structure**: presence server 160 and presence agent 150<br><br>**Algorithm**: Not Disclosed<br><br>Term is Indefinite | Plain and ordinary meaning, not subject to 35 U.S.C. § 112 ¶ 6.<br><br>But if the Court deems this term is subject to 35 U.S.C. § 112 ¶ 6:<br><br>**Function**: authenticating one of said presence contributors to determine said access rules associated with said one of said presence contributors<br><br>**Structure**: multiple access presence agent with presence server, and equivalents thereof<br><br>Furthermore, if the Court deems disclosure of an algorithm is required:<br><br>**Algorithm**: determine if said presence contributor is authenticated based on provided authentication credentials |

As discussed above, this term is subject to 35 U.S.C. § 112 ¶ 6 and is directed to a computer-implemented function to be performed in software, requiring disclosure of an algorithm for performing the function.  The parties appear to agree on the function and structure, reducing the dispute to whether the required algorithm is disclosed. It is not.

It is not sufficient to point to a recitation of the function to be performed without explaining *how* the function is to be performed, but that is exactly what WSOU seeks to do here. *Blackboard, Inc v. Desire2Learn, Inc.*, 574 F.3d 1371, at 1384 (Fed. Cir. 2009). Here, there is no information about how to actually accomplish the function of this means term—there is no textual, flow chart, mathematical formula, or other description of steps to be used for "authenticating one of said presence contributors to determine said access rules associated with said one of said presence contributors." *Finisar*, 523 F.3d at 1340-41. WSOU simply identifies seven entirely separate portions of the specification describing authentication credentials or their

22

significance and tries to turn them into an alleged algorithm. Specifically, it points to portions of the specification that describe: (1) that authentication credentials may be assigned to a user or presence contributor (2:21-26, 8:5-22, Fig. 5), (2) what an authentication credential may be (6:44-53), (3) that the presence contributor must provide its authentication credentials to the presence agent for authentication (7:4-12, 7:42-47), and (4) that authentication is required for access to the presence information (1:32-34). Each of these is definitional or functional. None comes close to describing how to carry out the function of "authenticating" one of said presence contributors to determine said access rules associated with said one of said presence contributors because no such disclosure is present in the specification, as required. Certainly, none of these disclosures identified by WSOU is a "step-by-step procedure for accomplishing" the required function. *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012). Such an utter lack of algorithm disclosed anywhere in the specification renders this term indefinite. *Ergo Licensing*, 673 F.3d at 1363.

> 3.   **means for enabling access to said presence information of said presentity by said one of said presence contributors based on said access rules associated with said one of said presence contributors (Claim 1)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| **Function**: enabling access to said presence information of said presentity by said one of said presence contributors based on said access rules associated with said one of said presence contributors | Plain and ordinary meaning, not subject to 35 U.S.C. § 112 ¶ 6. |
| | But if the Court deems this term is subject to 35 U.S.C. § 112 ¶ 6: |
| **Structure**: presence server 160, presence agent 150, presence user agent 140, and communications network 130 | **Function**: enabling access to said presence information of said presentity by said one of said presence contributors based on said access rules associated with said one of said presence contributors |
| **Algorithm**: Not Disclosed | |
| Term is Indefinite | **Structure**: multiple access presence agent with presence server, and equivalents thereof |

|  | Furthermore, if the Court deems disclosure of an algorithm is required:<br><br>**Algorithm**: determine access rules for said one of said presence contributors and granting said one of said presence contributors the rights and privileges associated with said access rules |
| --- | --- |

As discussed above, this term is subject to 35 U.S.C. § 112 ¶ 6 and is directed to a computer-implemented function to be performed in software, requiring disclosure of an algorithm for performing the function. As the parties agree on the function, the dispute reduces to identifying the required structure and algorithm, if disclosed.

WSOU argues that the corresponding structure is simply a multiple access presence agent with presence server, and equivalents thereof.  Dkt. 46 at 17.  This is insufficient structure for the recited function of enabling access to presence information of the presentity *by said one of said presence contributors* based on said access rules associated with said one of said presence contributors, which logically requires some mechanism by which a presence contributor may communicate with the presence agent to access the presence information. The only structure disclosed in the specification for communications between presence contributors and the presence agent is the communications network 130.  See EX. 2 Fig. 1.  Further, a person of ordinary skill would understand that viewing, setting, or changing (*i.e.*, accessing) presence information of the presentity by a presence contributor requires a presence user agent such as presence user agent 140 that interfaces with the presence contributor and provides updated information to the presence agent.  *See id*. at 3:7-8; 3:41-57; 4:37-39. Microsoft's proposal properly captured the necessary structural requirements to carry out the recited function.

However, the claim is indefinite because the patent once again fails to disclose any algorithm for how to actually perform the function.  Once again, there is no detail provided in the specification about how to accomplish the function of this means term, whether in the form of

textual, flow charts, mathematical formulae, or other descriptions of an algorithm. *Finisar*, 523 F.3d at 1340-41.  WSOU unsurprisingly fails to identify any such algorithm. Instead, it points to disparate and unconnected portions of the specification that describe only general capabilities of the multiple access presence agent (EX. 2 at 1:63-2:2), or repeat some or all of the overall set of means terms included in claim 1 (*Id*. at 7:9-30; 7:61-8:22; Figs. 3 and 5), and attempt to turn that into an alleged algorithm.  But none explains how the function is to be carried out, and hence none discloses any algorithm for enabling access to said presence information of said presentity by said one of said presence contributors based on said access rules associated with said one of said presence contributors.  At most, the disclosures identified by WSOU amount to nothing more than a restatement of the function itself.  Because there is no algorithm disclosed anywhere in the specification, this term is indefinite. *Ergo Licensing*, 673 F.3d at 1363.

    **4.**    **means for enabling access further includes means for filtering said presence information of said presentity based on said access rules of said one of said presence contributors to produce filtered presence information and means for providing said filtered presence information to said one of said presence contributors (Claim 1)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| "means for enabling access further includes means for filtering said presence information of said presentity based on said access rules of said one of said presence contributors to produce filtered presence information"<br><br>**Function**: filtering said presence information of said presentity based on said access rules of said one of said presence contributors to produce filtered presence information<br><br>**Structure**: presence server 160 and presence agent 150 with access rules 210<br><br>**Algorithm**: Not Disclosed<br><br>Term is Indefinite | Plain and ordinary meaning, not subject to 35 U.S.C. § 112 ¶ 6.<br><br>But if the Court deems this term is subject to 35 U.S.C. § 112 ¶ 6, and to the extent Defendant's proposal is understandable:<br><br>**Function 1 of 2**: filtering said presence information of said presentity based on said access rules of said one of said presence contributors to produce filtered presence information<br><br>**Structure 1 of 2**: multiple access presence agent with presence server, and equivalents thereof<br><br>Furthermore, if the Court deems disclosure of an algorithm is required: |

| | |
|---|---|
| "means for providing said filtered presence information to said one of said presence contributors" <br><br> **Function**: providing said filtered presence information to said one of said presence contributors <br><br> **Structure**: presence server 160, presence agent 150, presence user agent 140, and communications network 130 or 135 <br><br> **Algorithm**: Not Disclosed <br><br> Term is Indefinite | **Algorithm 1 of 2**: select some or all of said presentity's presence information to allow said one of said presence contributor to access or view <br><br> **Function 2 of 2**: providing said filtered presence information to said one of said presence contributors <br><br> **Structure 2 of 2**: multiple access presence agent with presence server, and equivalents thereof <br><br> Furthermore, if the Court deems disclosure of an algorithm is required: <br><br> **Algorithm 2 of 2**: allow said one of said presence contributor to access or view the selected some or all of said |

As discussed above, this double-means term is subject to 35 U.S.C. § 112 ¶ 6 and is directed to computer-implemented functions to be performed in software, requiring disclosure of an algorithm for performing each function. As the parties agree on the functions, the dispute reduces to identifying the required structure and algorithm, if any is disclosed for each of the two recited functions.

As to the first function, "filtering said presence information of said presentity based on said access rules of said one of said presence contributors to produce filtered presence information," WSOU argues that the corresponding structure is simply a multiple access presence agent with presence server, and equivalents thereof. Dkt. 46 at 19. Yet, the specification describes presence server 160 and presence agent 150 *with access rules 210* for performing this function.

But regardless of the parties' disagreement regarding the corresponding structure, the claim is indefinite because the patent fails to disclose an algorithm for performing the function.

WSOU fails to identify any algorithm disclosed in the specification for "filtering said presence information of said presentity based on said access rules of said one of said presence

contributors to produce filtered presence information." Instead, WSOU crafts its own algorithm, which is found nowhere in the specification or the claims.  Its proposed algorithm, "select some or all of said presentity's presence information to allow said one of said presence contributor to access or view," is allegedly supported by four disparate and unconnected portions of the specification, but a review of those citations reveals that none discloses how to perform the claimed function. The first citation that WSOU points to merely states that the presence agent filters the presence information in accordance with the access rules. EX. 2 at 7:48-54.  The remainder state that access rules or preference information may contain filters for controlling access. *Id*. at 4:44-55, 5:48-6:11, 8:1-4.  None of these citations discloses how to filter said presence information of said presentity based on said access rules of said one of said presence contributors to produce filtered presence information, much less provides any sort of step-by-step procedure, in the form of text, flow charts, or other descriptions, for accomplishing the function. *Finisar*, 523 F.3d at 1340-41; *Ergo Licensing*, 673 F.3d at 1365. At most, the disclosures identified by WSOU restate the function itself, which the law does not consider to meet the algorithm requirement.  *Blackboard*, 574 F.3d at 1384.

As to the second function, "providing said filtered presence information to said one of said presence contributors,"  WSOU argues again that the corresponding structure is simply a multiple access presence agent with presence server, and equivalents thereof.  Dkt. 46 at 20.  But the specification describes that in addition to presence server 160 and presence agent 150, presence user agent 140, and communications network 130 or 135 are required for performing the recited function. The function of providing said filtered presence information to said one of said presence contributors which would be understood to require a mechanism by which a presence agent may communicate with the presence contributor to provide the filtered presence information. The only structure disclosed in the specification for communications between presence contributors and

the presence agent is the communications network 130.  See EX. 2 Fig. 1.  Further, a person of

ordinary skill would understand that viewing, setting, or changing (*i.e.*, accessing) presence

information of the presentity by a presence contributor requires a presence user agent such as

PUA 140 that interfaces with the presence contributor and provides updated information to the

presence agent.  See EX. 2 at 3:7-8; 3:41-57; 4:37-39.  Regardless, though, of the parties'

disagreement regarding the corresponding structure, the claim is indefinite for failure to disclose

an algorithm for performing the function.

In lieu of identifying any disclosed algorithm for "providing said filtered presence

information to said one of said presence contributors," WSOU offers a paraphrasing of a portion of

the specification: "allow said one of said presence contributor to access or view the selected

some or all of said presentity's presence information."  *See* EX. 2 at 6:6-11 ("access rule A may

allow presence contributor A to access/view some or all of the presentity's presence information

180a and/or some or all of the presentity's buddies' presence information (*e.g.,* an assistant 10 has

access to professional contacts, but not to personal contacts on the manager's buddy list)).

However, access rules allowing access to some portion of the presence information would not be

understood to be the same as "providing said filtered presence information to said one of said

presence contributors," and the specification excerpt WSOU paraphrases does not provide step-

by-step information for performing the function.  *See id*. at 5:62-65.  WSOU further points to

four disparate and unconnected portions of the specification, the most relevant of which merely

restates the function itself with no description of the steps required to perform the function. *See*

*id*. at 7:48-54. That is not allowed. *Blackboard*, 574 F.3d at 1384.  None of the portions of the

specification cited by WSOU discloses how to provide said filtered presence information to said

one of said presence contributors.  Because there is no algorithm disclosed anywhere in the

specification for either of the functions encompassed by this term, this claim term is indefinite.

> **5.**     **means for enabling access further includes means for enabling said one of said presence contributors to update said presence information of said presenty based on said access rules of said one of said presence contributors (Claim 1)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| **Function**: enabling said one of said presence contributors to update said presence information of said presenty based on said access rules of said one of said presence contributors | Plain and ordinary meaning, not subject to 35 U.S.C. § 112 ¶ 6. |
| **Structure**: presence contributors 120, presence server 160, presence agent 150 with access rules 210, presence user agent 140, and communications network 130 | But if the Court deems this term is subject to 35 U.S.C. § 112 ¶ 6: |
| **Algorithm**: Not Disclosed | **Function**: enabling said one of said presence contributors to update said presence information of said presenty based on said access rules of said one of said presence contributors |
| Term is Indefinite | **Structure**: multiple access presence agent with presence server, and equivalents thereof |
| | Furthermore, if the Court deems disclosure of an algorithm is required: |
| | **Algorithm**: providing one of said presence contributors the ability to set/change the presence information of said presenty subject to any limits on the ability according to said access rules |

As discussed above, this term is subject to 35 U.S.C. § 112 ¶ 6 and is directed to a

computer-implemented function to be performed in software, requiring disclosure of an

algorithm for performing the function. As the parties agree on the function, the dispute reduces

to identifying the required structure and algorithm, if any, disclosed for the recited function.

WSOU argues that the corresponding structure is limited to a multiple access presence

agent with presence server, and equivalents thereof.  Dkt. 46 at 22.  The patent, however,

identifies presence contributors 120, presence server 160, presence agent 150 with access rules 210,

presence user agent 140, and communications network 130 for performing the recited function of

29

enabling access to presence information of the presentity *by said one of said presence contributors* based on said access rules associated with said one of said presence contributors, which would be understood to require a mechanism by which a presence contributor may communicate with the presence agent to access the presence information.  Indeed, the only structure disclosed in the specification for communications between the presence contributors and the presence agent is the communications network 130.  *See* EX. 2 at Fig. 1.  Further, a person of ordinary skill would understand that viewing, setting, or changing (*i.e.*, accessing) presence information of the presentity by a presence contributor requires a presence user agent such as PUA 140 that interfaces with the presence contributor and provides updated information to the presence agent. *See Id*. at 3:7-8; 3:41-57; 4:37-39.

However, the claim is indefinite because the patent fails to disclose an algorithm for performing the function.  WSOU identifies no algorithm disclosed in the specification for "enabling said one of said presence contributors to update said presence information of said presentity based on said access rules of said one of said presence contributors." Instead, WSOU points to five separate portions of the specification to try to craft an alleged algorithm, but its attempt fails.  Its specification cites, instead, include a disclosure that access rules define rights and privileges of presence contributors which may include the right to set/change presence information (EX. 2 at 5:48-6:1, 6:12-22), the capability for the presence contributor to update presence information (*id*. at 7:44-60), and several instances in which the specification merely repeats some or all of the overall set of means terms included in claim 1 (*id*. at 7:13-30; 7:65-8:4).  None of these describes how the system goes about "enabling said one of said presence contributors to update said presence information of said presentity based on said access rules of said one of said presence contributors."  At most, the disclosures identified by WSOU amount to

nothing more than a restatement of the function.  *Blackboard*, 574 F.3d at 1384.  Because there is

no algorithm disclosed anywhere in the specification, this term is indefinite.

> **6.      means for enabling access further includes means for enabling said one of said presence contributors to define preference information associated with said presence information of said presently based on said access rules of said one of said presence contributors (Claim 1)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
| --- | --- |
| **Function:** enabling said one of said presence contributors to define preference information associated with said presence information of said presently based on said access rules of said one of said presence contributors | Plain and ordinary meaning, not subject to 35 U.S.C. § 112 ¶ 6. |
| | But if the Court deems this term is subject to 35 U.S.C. § 112 ¶ 6: |
| **Structure:** presence server 160, presence agent 150 with access rule 210, presence user agent 140, and communications network 130 | **Function**: enabling said one of said presence contributors to define preference information associated with said presence information of said presently based on said access rules of said one of said presence contributors |
| **Algorithm**: Not Disclosed | **Structure**: multiple access presence agent with presence server, and equivalents thereof |
| Term is Indefinite | Furthermore, if the Court deems disclosure of an algorithm is required: |
| | **Algorithm**: providing one of said presence contributors the ability to set/change the preference information of said presently subject to any limits on the ability according to said access rules |

As discussed above, this term is subject to 35 U.S.C. § 112 ¶ 6 and is directed to a

computer-implemented function to be performed in software, requiring disclosure of an

algorithm for performing the function. The parties agree on the function.  Thus, the dispute

reduces to identifying the required structure and algorithm, if any is disclosed for the recited

function.

Fig. 1 illustrates the overall system of the '550 patent that contains the structures

necessary to perform the claimed function.  Each of the embodiments described in the

specification is implemented in a presence system of the type disclosed in Fig. 1.

The concept of preference information, required by the function of this means-plus-function claim term to be "associated with said presence information of said presentity based on said access rules of said one of said presence contributors," is only mentioned in four places in the specification, including preference information 190 shown in Fig. 1. *Id*. at  Fig. 1. The specification describes "preference information 190" as being stored by presence server 160:

> ***The presence server 160 further stores preference information 190*** for the presentities 110 and watchers 170 of the presence system 100. For example, the preference information 190 can include both presentity preference information (*e.g.*, privacy filters) set by the presentity 110 for each watcher 170 and watcher preference information (*e.g.*, watcher filters) set by each watcher 170 for presentities 110. The preference information 190 operates to filter the presence information 180 of a presentity 110 provided to a watcher 170 to accommodate privacy concerns, prioritization requirements, viewing requirements, administrator policies and security considerations.

*Id*. at 4:44-55. Thus, the structure here associated with the function of "enabling said one of said presence contributors to define preference information…" must include presence server 160 for storing the preference information associated with presence information of the presentity.

The specification goes on to describe that presence agent 150 with access rules 210 are also required to carry out the claimed function.  *Id.* at 6:23-31 ("access rules 210 may define the scope and/or ability of the presence contributor 120 to set/change preference information for the presentity…"); *id.* at 7:21-30 ("At 380, the presence agent 150 grants presence contributor B the rights and privileges associated with the access rules for presence contributor B, and at 390, engages in a communication session with presence contributor B with the granted rights and privileges. During the communication session with presence contributor B, presence contributor B may view, set and/or change presence information of the presentity and set or change preference information of the presentity based on the access rules associated with presence contributor B.").

Communications network 130 is the only structure disclosed in the specification for communications between the presence contributors and the presence agent.  *See Id*. at Fig. 1 (illustrating a communications network 130 for communications between the presence agent and other components such as the PUA 140, presence contributors 120, and the presentity 110).  A person of ordinary skill would understand that the "communication session" during which a presence contributor may "set or change preference information of the presentity based on the access rules" must occur by way of the communications network 130.  Further, a person of ordinary skill would understand that setting or changing information of the presentity by a presence contributor requires a presence user agent such as PUA 140 that interfaces with the presence contributor and provides updated information to the presence agent.  *See Id*. at 3:7-8; 3:41-57; 4:37-39.

The patent specification of the '550 patent thus requires that the means to "enable said one of said presence contributors to define preference information associated with said presence information of said presentity based on said access rules of said one of said presence contributors" must include presence server 160 for storing the preference information associated with presence information of the presentity, a presence agent 150 with access rule 210 for managing rights based on said access rules, a presence user agent 140 for interfacing with the presence contributor, and a communications network 130 for establishing a communication session in which the presence contributor may view or set the preference information.

WSOU seeks to exclude elements of the required structure identified by Microsoft, stating that "[f]or example, the specification describes that in order to restrict access to the presence information managed by multiple presence agents, ***access rules may be created to define the scope and/or ability of a presence contributor to set/change the preference information of a presentity***." This argument misses the entire point of the claimed function,

33

which requires a means to enable "presence contributors to define preference information …

based on said access rules."

WSOU also fails to identify any algorithm disclosed in the specification for "enabling

said one of said presence contributors to define preference information associated with said

presence information of said presentity based on said access rules of said one of said presence

contributors." This is not surprising, as there is none, and its alleged algorithm certainly is not

found anywhere in the specification.  WSOU points to three entirely separate portions of the

specification stating that the multiple access presence agents are "capable of defining access

rules 210 for each of the presence contributors 120," (*id*. at 5:48-52),  that access rules may

define the scope and/or ability of the presence contributor 120 to set/change preference

information for the presentity," (*id*. at 6:23-31), and that the multiple access presence agent grant

can grant access to the presence information of a presentity based on the access rules. *Id*. at 8:18-

22. None of these describes how the system goes about enabling a presence contributor to define

preference information associated with said presence information of said presentity based on said

access rules of said one of said presence contributors.

Microsoft's proposed structure is consistent with the specification and complete. But,

because there is no algorithm disclosed anywhere in the specification, this term is indefinite.

> **7.      means for authenticating further includes means for assigning
>         authentication credentials to each of said presence contributors and
>         means for receiving said authentication credentials of said one of said
>         presence contributors to authenticate said one of said presence
>         contributors (Claim 4)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| "means for assigning authentication credentials to each of said presence contributors"<br><br>**Function**: assigning authentication credentials to each of said presence contributors | Plain and ordinary meaning, not subject to 35 U.S.C. § 112 ¶ 6. |

| | |
|---|---|
| **Structure**: presentity 110 and presence server 160 with presence agent 150<br><br>**Algorithm**: Not Disclosed<br><br>Term is Indefinite<br><br>"means for receiving said authentication credentials of said one of said presence contributors to authenticate said one of said presence contributors"<br><br>**Function**: receiving said authentication credentials of said one of said presence contributors to authenticate said one of said presence contributors<br><br>**Structure**:<br><br>presence contributors 120, presence server 160, presence agent 150, presence user agent 140, and communications network 130 or 135<br><br>**Algorithm**: Not Disclosed<br><br>Term is Indefinite | But if the Court deems this term is subject to 35 U.S.C. § 112 ¶ 6, and to the extent Defendant's proposal is understandable:<br><br>**Function 1 of 2**: assigning authentication credentials to each of said presence contributors<br><br>**Structure 1 of 2**: multiple access presence agent with presence server, and equivalents thereof<br><br>Furthermore, if the Court deems disclosure of an algorithm is required:<br><br>**Algorithm 1 of 2**: associating authentication credentials with each of said presence contributors<br><br>**Function 2 of 2**: receiving said authentication credentials of said one of said presence contributors to authenticate said one of said presence contributors<br><br>**Structure 2 of 2**: multiple access presence agent with presence server, and equivalents thereof<br><br>Furthermore, if the Court deems disclosure of an algorithm is required:<br><br>**Algorithm 2 of 2**: not required under *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303 (Fed. Cir. 2011) |

As discussed above, this double means term is subject to 35 U.S.C. § 112 ¶ 6 and is directed to a computer-implemented function to be performed in software, requiring disclosure of an algorithm for performing the function. As the parties agree on the function, the dispute reduces to identifying the required structure and algorithm, if any is disclosed for the recited function.

As to the first function: "assigning authentication credentials to each of said presence contributors," WSOU argues that the corresponding structure is limited to a multiple access presence agent with presence server, and equivalents thereof. Dkt. 46 at 19. The patent, however, describes presentity 110 and presence server 160 with presence agent 150 as providing this

function.  Nonetheless, regardless of the parties disagreement regarding the corresponding

structure, the claim is indefinite because the patent fails to disclose an algorithm for performing

the function.

WSOU fails to identify any algorithm disclosed in the specification for "assigning

authentication credentials to each of said presence contributors." Instead, WSOU crafts its own

algorithm, "associating authentication credentials with each of said presence contributors,"

which appears at no point in the specification or claims.  As support, WSOU points to four

disparate and unconnected portions of the specification, including a statement in the summary of

the invention that in some embodiments the multiple access presence agent assigns

authentication credentials to presence contributors (EX. 2 at 2:21-26), that a presence contributor

may provide its authentication credentials to the presence agent (*id*. at 7:4-12 and 7:42-47), and

the mere statement that authentication credentials are defined for each potential presence

contributor (*id*. at 8:5-22 and Fig. 5).  None of these portions of the specification discloses *how*

the system goes about assigning authentication credentials to each of said presence contributors.  At

best, the disclosures identified by WSOU amount to nothing more than a restatement of the

function itself.

As to the second function, "receiving said authentication credentials of said one of said

presence contributors to authenticate said one of said presence contributors," WSOU argues that the

corresponding structure is limited to a multiple access presence agent with presence server, and

equivalents thereof.  Dkt. 46 at 20.  This is insufficient structure for the recited function, which

would be understood to require a mechanism by which a presence agent may communicate with the

presence contributor to provide the filtered presence information.  The patent describes presence

contributors 120, presence server 160, presence agent 150, presence user agent 140, and

communications network 130 or 135 as providing this function.  The only structure disclosed in

36

the specification for communications between the presence contributors and the presence agent is the communications network 130.  *See* EX. 2 Fig. 1.  Further, a person of ordinary skill would understand that viewing, setting, or changing (*i.e.*, accessing) presence information of the presentity by a presence contributor requires a presence user agent such as PUA 140 that interfaces with the presence contributor and provides updated information to the presence agent. *See* EX. 2 at 3:7-8; 3:41-57; 4:37-39.  But, regardless of the parties' disagreement as to the corresponding structure, the claim is indefinite because the patent fails to disclose an algorithm for performing the function.

WSOU fails to identify any algorithm disclosed in the specification for "receiving said authentication credentials of said one of said presence contributors to authenticate said one of said presence contributors," arguing instead that no algorithm is necessary for the function "receiving."  In support, WSOU relies on a decision by the Federal Circuit *in In re Katz Interactive Call Processing Patent Litig.*, in which the Court determined that in certain contexts, some functions such as "receiving" may not require disclosure of more structure than the general purpose processor that performs those functions. 639 F.3d at 1303 (Fed. Cir. 2011).  However, the Federal Circuit did not stand for the broad proposition that "receiving" as a general principle does not ever require disclosure of an algorithm. *See Id.*  In fact, the Court found that several of Katz's claims that included a means-plus function limitation that recited "processing means ... for receiving customer number data entered by a caller and for storing the customer number data ... and based on a condition coupling an incoming call to the operator terminal, the processing means visually displaying the customer number data" were "clearly indefinite under the principles of WMS Gaming, Aristocrat, and Harris," because the claims did not disclose an algorithm corresponding to the do not disclose an algorithm that corresponds to the "based on a condition coupling an incoming call to the operator terminal" function.  *Id*. at 1315.  The court

noted that "Computers can be programmed to conditionally couple calls in many ways. Without any disclosure as to the way Katz's invention conditionally couples calls, the public is left to guess whether the claims cover only coupling based on particular system conditions, such as the availability of an operator, or are broad enough to cover any coupling in conjunction with an if-then statement in source code." *Id*.

The claim limitation "receiving said authentication credentials of said one of said presence contributors *to authenticate said one of said presence contributors*," requires not simply receiving, but additionally requires the means to authenticate said one of said presence contributors. A computer can implement any number of methods to authenticate a user or other device (*i.e.*, a presence contributor). Thus, the claim includes the type of "narrower construction" requiring the processor to be a processor programmed to perform the specialized function, and disclosure of an algorithm is necessary to in from the public to what the claim covers. *Id*.  Because no such algorithm exists in the specification, the claim is indefinite.

>8. **means for enabling further includes means for enabling access to said presence information of said presentity by multiple ones of said presence contributors simultaneously based on said respective access rules associated with said multiple ones of said presence contributors (Claim 6)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| **Function**: enabling access to said presence information of said presentity by multiple ones of said presence contributors simultaneously based on said respective access rules associated with said multiple ones of said presence contributors<br><br>**Structure**: presence server 160, presence agent 150, presence user agents 140, and communications network 130<br><br>**Algorithm**: Not Disclosed<br><br>Term is Indefinite | Plain and ordinary meaning, not subject to 35 U.S.C. § 112 ¶ 6.<br><br>But if the Court deems this term is subject to 35 U.S.C. § 112 ¶ 6:<br><br>**Function**: enabling access to said presence information of said presentity by multiple ones of said presence contributors simultaneously based on said respective access rules associated with said multiple ones of said presence contributors<br><br>**Structure**: multiple access presence agent with presence server, and equivalents thereof |

| | Furthermore, if the Court deems disclosure of an algorithm is required:<br><br>**Algorithm**: provide access by multiple ones of said presence contributors simultaneously to said presence information of said presentity, each of said presence contributors possibly having different rights and privileges to said presence information based on said respective access rules |
|---|---|

As discussed above, this term is subject to 35 U.S.C. § 112 ¶ 6 and is directed to a computer-implemented function to be performed in software, requiring disclosure of an algorithm for performing the function. As the parties agree on the function, the dispute reduces to identifying the required structure and algorithm, if any is disclosed for the recited function.

WSOU argues that the corresponding structure is limited to a multiple access presence agent with presence server, and equivalents thereof. Dkt. 46 at 17. This is insufficient structure for the recited function of enabling access to said presence information of said presentity *by multiple ones of said presence contributors* simultaneously based on said respective access rules associated with said multiple ones of said presence contributors, which would be understood to require a mechanism by which the presence contributors may communicate with the presence agent to simultaneously access the presence information. The patent describes presence server 160, presence agent 150, presence user agents 140, and communications network 130 as providing this function. The only structure disclosed in the specification for communications between the presence contributors and the presence agent is the communications network 130. See EX. 2 at Fig. 1. Further, a person of ordinary skill would understand that viewing, setting, or changing (*i.e.*, accessing) presence information of the presentity by a presence contributor requires a presence user agent such as PUA 140 that interfaces with the presence contributor and provides updated information to the presence agent. See EX. 2 at 3:7-8; 3:41-57; 4:37-39.

The claim is indefinite because the patent fails to disclose an algorithm for performing the function.  WSOU attempts to craft its own algorithm, but it fails to identify any algorithm disclosed in the specification for "enabling access to said presence information of said presentity by multiple ones of said presence contributors simultaneously based on said respective access rules associated with said multiple ones of said presence contributors." Instead, WSOU point to disparate and unconnected portions of the specification, including a recitation in the summary of the invention describing general capabilities of the multiple access presence agent (EX. 2 at 1:63-2:2), and cites several instances in which the specification repeats some or all of the overall set of means terms included in claim 1 (*Id.* at 7:9-30; 7:61-8:22; Figs. 3 and 5).  None of these portions of the specification discloses how the system enables access to said presence information of said presentity by said one of said presence contributors based on said access rules associated with said one of said presence contributors.  At most, the disclosures identified by WSOU restate the function.  Because there is no algorithm disclosed anywhere in the specification, this term is indefinite.

C.   **Other Disputed Terms**

1.   **"presentity" / "presentities" (Claims 1, 8 and 11) and "presence contributor" (Claims 1, 8, and 11)**

| Microsoft's Proposed Constructions | WSOU's Proposed Constructions |
|---|---|
| Presentity: the entity whose presence is being represented | Presentity: Plain and ordinary meaning |
| Presence contributor: an entity that provides presence information about a presentity to a presence server or presence agent | Presence contributor: Plain and ordinary meaning |

Here, the parties dispute what the term "presentity" means, and whether it is synonymous with the different term "presence contributor."  Both "presentity" and "presence contributors" are coined terms for concepts central to the claimed invention.  The intrinsic evidence

40

demonstrates that they are not synonymous, but instead have different meanings captured by Microsoft's proposed constructions. WSOU's view, though, is evidently that the terms have the same scope.[4]

Microsoft's proposed construction illuminates the different roles of a "presentity" / "presentities" and "presence contributors" in the system described by the '550 patent, as well as the relationship between these distinct claim elements.  A "presentity" is a person, group, thing, etc. (*i.e.* an entity) that is being represented by a presence state, while a "presence contributor" is a person, group, thing, etc. (*i.e.* an entity) that provides presence information about the presentity's presence state to a presence server or presence agent.

As an initial matter, the term "entity" in Microsoft's proposal is not intended to narrow the scope of either term, but rather to capture accurately, using understandable language, just *who* or *what* a presentity is, as that is not a term that any juror would otherwise understand. "Presentity" is not a term in the ordinary lexicon – it is a coined term specifically applicable to the field of interactive communications relevant to the patent.  On the other hand, the term "entity" is within the common lexicon and explains what a presence contributor actually is, as opposed to just what it does.

The specification distinguishes between these two claim terms, talking about them separately and in their relationship to one another. For example, the '550 Patent states that "a multiple access presence agent ***collects and stores presence information on a presentity from***

---

[4] WSOU states that "***In other words, presentities can be anything and are without limit, so long as it can provide presence information indicating the presentity's presence state***."  (Dkt. 46 at 33).  WSOU then goes on to make the exact same statement regarding what a "presence contributor" may be: "***In other words, presence contributors can be anything and are without limit, so long as it can provide presence information indicating the presentity's presence state***." (Dkt. 46 at 34).

*presence contributors…*" EX. 2 at 1:56-58.  The specification goes on to provide examples of presentities, such as a room within a hotel or a user/subscriber, whose status may be represented. *Id.* at 5:31-47.  By contrast, presence contributors are described as providing presence information indicating the presentity's presence state to the multiple access presence agent.  *See Id*.  The '550 Patent further describes that "presence contributors 120c is a user-operated physical communications" such as a desktop phone, and notes that "when a presentity initiates or answers a phone call on a terminal 120c, the PUA 140c associated with the terminal 120c updates the presentity's presence state to 'On the Phone.'" *Id*. at 3:18-4:3. According to the specification, then, the presentity is the who or what (*i.e.*, the entity) that is being represented with a presence state in the presence server or agent, while the presence contributor is the who or what (*i.e.*, entity) that provides information about the presentity's current presence state to the presence server or presence agent.

WSOU's apparent argument that both "presentity" and "presence contributor" perform the same function within the claimed system is directly contrary to the intrinsic evidence.  Dkt. 46 at 33-34.  Microsoft's proposed constructions for the terms "presentity" / "presentities" and "presence contributors" are thus necessary to ensure the terms are understood in a manner consistent with the '550 patent.  *See Markman v. Westview Instruments, Inc*., 517 U.S. 370, 389 (1996); *see also Phillips v. AWH Corp*., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

DATED: January 29, 2021 By: _/s/ Irene Yang_____

Barry K. Shelton
Texas State Bar No. 24055029
SHELTON COBURN LLP
311 RR 620 S, Suite 205
Austin, TX 78734
Telephone: (512) 263-2165
Fax: (512) 263-2166
bshelton@sheltoncoburn.com

*Of Counsel*

Michael J. Bettinger
Irene Yang
SIDLEY AUSTIN LLP
555 California St., Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Fax: (415) 772-7400
mbettinger@sidley.com
irene.yang@sidley.com

Richard A. Cederoth
John W. McBride
SIDLEY AUSTIN LLP
1 South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Fax: (312) 853-7036
rcederoth@sidley.com
jwmcbride@sidley.com

*Attorneys for Defendant Microsoft Corporation*

43

**CERTIFICATE OF SERVICE**

I certify that on January 29, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record as identified below.

*/s/ Irene Yang*
Irene Yang