**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC, d/b/a BRAZOS LICENSING AND DEVELOPMENT<br><br>        Plaintiff,<br><br>                v.<br><br>MICROSOFT CORPORATION,<br><br>        Defendant. | Civil Action No. 6:20-cv-00456<br>Civil Action No. 6:20-cv-00458 |

## DEFENDANT'S SUR-REPLY MARKMAN BRIEF

## TABLE OF CONTENTS

I.   WSOU MISSTATES CLAIM CONSTRUCTION PRINCIPLES................................1

II.   THE '868 CLAIM TERMS ...........................................................................1

A.   Agreed Terms...............................................................................................1

B.   "access gateway" (Claims 1 and 18)............................................................1

C.   "emergency call router" (Claim 1 and 18)....................................................4

D.   "target gateway" (Claims 1 and 18).............................................................7

E.   "selectably operable" (Claims 1 and 13) and "selectably routing" (Claim
18) .................................................................................................................8

F.   "the apparatus of claim 1 wherein the communication system further
comprises a local-network alternate station, wherein said emergency call
muter is further for determining whether the call of the selected call-type shall
be completable by way of the normal-operation communication link and for
rerouting a call request to the local-network alternate station upon
determination that the call completion by way of the normal-operation
communication link" (Claim 12) ...................................................................9

III.   THE '550 CLAIM TERMS ...........................................................................11

A.   Means Terms................................................................................................11

1. means for defining access rules for each of said presence
contributors, said access rules associated with each of said
presence contributors defining respective rights and privileges of
said presence contributors to access said presence information of
said presentity after said presence contributors have provided
said presence information to said presence server (Claim 1) ......................16

2. means for authenticating one of said presence contributors to
determine said access rules associated with said one of said
presence contributors (Claim 1)..................................................................17

3. means for enabling access to said presence information of said
presentity by said one of said presence contributors based on said
access rules associated with said one of said presence
contributors (Claim 1)..................................................................................19

4. means for enabling access further includes means for filtering
said presence information of said presentity based on said access
rules of said one of said presence contributors to produce filtered
presence information and means for providing said filtered
presence information to said one of said presence contributors
(Claim 1) .....................................................................................................20

5. means for enabling access further includes means for enabling
said one of said presence contributors to update said presence
information of said presentity based on said access rules of said
one of said presence contributors (Claim 1) ...............................................21

6. means for enabling access further includes means for enabling said one of said presence contributors to define preference information associated with said presence information of said presently based on said access rules of said one of said presence contributors (Claim 1)...........................................................................22

7. means for authenticating further includes means for assigning authentication credentials to each of said presence contributors and means for receiving said authentication credentials of said one of said presence contributors to authenticate said one of said presence contributors (Claim 4).........................................................23

8. means for enabling further includes means for enabling access to said presence information of said presently by multiple ones of said presence contributors simultaneously based on said respective access rules associated with said multiple ones of said presence contributors (Claim 6).................................................24

B.  "presently" / "presenties" (Claims 1, 8 and 11) and "presence contributor" (Claims 1, 8, and 11) .......................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008)...................................................................................3

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
  830 F.3d 1341 (Fed. Cir. 2016).................................................................................17

*In re Aoyama*,
  656 F.3d 1293 (Fed. Cir. 2011)...........................................................................17, 23

*Apex Inc. v. Raritan Comp., Inc.*,
  325 F.3d 1364 (Fed. Cir. 2003).................................................................................12

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008).................................................................................13

*ATD Corp. v. Lydall, Inc.*,
  159 F.3d 534 (Fed. Cir. 1998).....................................................................................5

*Augme Techs., Inc. v. Yahoo! Inc.*,
  755 F.3d 1326 (Fed. Cir. 2014).........................................................................*passim*

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
  616 F.3d 1249 (Fed. Cir. 2010).................................................................................8

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009)...........................................................................15, 21

*Engel Indus., Inc. v. Lockformer Co.*,
  96 F.3d 1398 (Fed. Cir. 1996).....................................................................................8

*Enzo Biochem, Inc. v. Applera Corp.*,
  599 F.3d 1325 (Fed. Cir. 2010).................................................................................10

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
  673 F.3d 1361 (Fed. Cir. 2012)...............................................................15, 16, 24, 25

*Finisar Corp. v. DirecTV Grp., Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008).................................................................................17

*Function Media, L.L.C. v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013).................................................................................16

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
    902 F.3d 1372 (Fed. Cir. 2018)...........................................................................5

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015).........................................................................11

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008).........................................................................11

*Nevro Corp. v. Boston Scientific Corp.*
    955 F.3d 35, 43 (Fed. Cir. 2020)......................................................................13

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012).....................................................17, 19, 21, 22

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)...........................................................................1

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017).........................................................................10

*Sony Corp. v. Iancu*,
    924 F.3d 1235 (Fed. Cir. 2019).........................................................................12

*TecSec, Inc. v. Int'l Bus. Machs. Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013).........................................................................12

*TriMed, Inc. v. Stryker Corp.*,
    514 F.3d 1256 (Fed. Cir. 2008).........................................................................12

*Triton Tech of Texas, LLC v. Nintendo of Am., Inc.*,
    753 F.3d 1375 (Fed. Cir. 2014).........................................................................17

*Trs. of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016)...................................................................1, 2, 7

*Trusted Knight Corp. v. Int'l Bus. Machs. Corp.*,
    681 F. App'x 898 (Fed. Cir. 2017) ..............................................................10, 11

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011)...................................................................*passim*

*Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*,
    809 F. App'x 863 (Fed. Cir. 2020) ..............................................................15, 18, 21

*In re Varma*,
    816 F.3d 1352 (Fed. Cir. 2016)...........................................................................8

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007).........................................................................................13

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015).................................................................................12, 16

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999).........................................................................12, 13, 15

Microsoft submits this sur-reply in support of its proposed claim constructions addressing terms of U.S. Patent No. 7,388,868 ("the '868 patent") and 7,676,550 ("the '550 patent").[1]

# I.   WSOU MISSTATES CLAIM CONSTRUCTION PRINCIPLES

Explicit redefinition or disavowal is not required for claim construction. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). A claim term must be understood "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Claims do not stand alone, but are part of a fully integrated written instrument. *Id.* at 1315. Hence, "the specification is always highly relevant" and "is often the best guide to the meaning of a disputed term." *Trs. of Columbia Univ.*, 811 F.3d at 1365. "Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Id.* at 1364 (citing *Phillips*, 415 F.3d at 1320-21).

# II.   THE '868 CLAIM TERMS

## A.   Agreed Terms

The parties agree as to the terms "emergency call muter" (claim 12) and "origination station"/"originating station" (claims 1, 18). As to "terminating station" (claim 18), although unaddressed in WSOU's reply, it appears the parties agree the term does not need construction.

## B.   "access gateway" (Claims 1 and 18)

| Microsoft's Proposed Construction |
|---|
| gateway coupled to the packet data network for communication with a softswitch |

In reply, WSOU recognizes that the term "access" as it modifies "gateway" in the claim is critical to understanding the meaning of "access gateway." It cannot seriously dispute that a

---

[1] Emphases are added throughout, unless otherwise indicated.

"gateway" is "coupled to the packet data network." *See* 2:26-27. Nor does WSOU actually dispute that "access" modifies "gateway." The dispute is whether "access" modifies "gateway" in a manner other than the plain and ordinary meaning of "access" standing alone. It does.

"Access" is used in the claim to modify a "gateway" to provide necessary structural and functional orientation. In the context of the claimed invention and the problem to be solved, "access" differentiates the location and function of the claimed "access gateway" from others such as the "target gateway." Microsoft's proposal provides that meaning. *See* Resp. Br. at 3-7.

Relying on the claim language alone does not suffice. The remaining claim elements that WSOU points to mention the "access gateway" in relation to the emergency call router, target gateway, and other gateways, but do not explain what the access gateway is. Access gateways as described in the patent are not limited to being coupled to emergency call routers, or having a target gateway on the other side of the emergency call router, or being part of a functional aggregation point. Rather, they are repeatedly described as being coupled to the packet data network. Resp. Br. at 5-6.[2]

As to the term "gateway" itself, it is unclear what the issue is. A term that is discussed in the background portion of a patent specification explains it as generally understood in the prior art and certainly does not become value-less, as WSOU argues. On the contrary, claims are understood in light of the entire specification, and it would be error to construe a claim in a manner that is inconsistent with or that contradicts the background section of the specification. See *Trs. of Columbia Univ.*, 811 F.3d at 1362 (citing *Phillips*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)).[3] There is nothing controversial about the statement that "[d]evices referred to

---

[2] WSOU posits that unless the term "access" is used in the construction itself, the construction is improper. It points to no case law for its assertion, and there is no such rule. Reply Br. at 4.
[3] *Fisher-Rosemount* is inapposite. There, the terms "information clients" and "information

as gateways are coupled to the packet data network. Devices referred to as gateways form gateways to the packet data network." '868 at 2:26-29. Indeed, WSOU previously argued that "gateways" are a readily understood term of art (Op. Br. at 5), but now distances itself from the description in the patent. It does not argue that a "gateway" should be understood to mean anything different than what the patent states, or explain why it disagrees with the patent's description. WSOU's complaints that the "packet data network" is described in the background portion and thus cannot inform claim construction fail for the same reasons.

WSOU's attack on Microsoft's proposed construction, based on the '868 patent describing what happens when the communication link between an access gateway and the packet data network fails, only *reinforces* Microsoft's construction. The point of the '868 patent is to compensate for a failure of a communication link between an access gateway and the packet data network. However, Microsoft does not object to adding "in normal operation" to its construction (though it does not believe it to be necessary). The key concept is that the "access gateway" during normal operation connects the local network via a communication link to the packet data network. And, as discussed with respect to "target gateway" below, the access gateway as used in the claims is separate from the claimed target gateway.

Finally, there is no principle that a term must be recited as an element in the claim or else it cannot be part of the construction of another term, as WSOU contends. The Federal Circuit has held the opposite. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008) (determining no error in use of a word that does not appear in the claims or specification; "claim construction often calls upon words other than those of the patent, lest the claim simply define

---

servers" lacked clear, deliberate, and precise definition and thus the terms were not limited to capabilities disclosed in select specification passages when the remainder consistently described the terms more broadly.

itself. 'Claim construction' is for the purpose of explaining and defining terms in the claims, and usually requires use of words other than the words that are being defined.")

C.    **"emergency call router" (Claim 1 and 18)**

| Microsoft's Proposed Construction |
| --- |
| back-up call router that is operable only when the communication link fails |

WSOU no longer disputes that the claimed emergency call router is intended to be a backup in case normal call routing is disrupted due to communication link failure. Instead, it attacks the "operable only" portion of Microsoft's proposed construction. Here, WSOU insists that dependent claim 7 precludes Microsoft's proposed construction because the emergency call router is "operable **_at least_** responsive to failure of the normal-operation communication link." Reply Br. at 1. The language of claim 7 exposes the fundamental problem.

Claim 7 does not say the emergency call router is "operable at least responsive to failure"; rather, the call priority determiner is. On its face, it simply adds a component to the emergency call router. There is nothing logically inconsistent with that added component having functions outside of the emergency call router, as long as it is operable when the emergency call router is operating. The patent describes no other conditions where this component operates, nor does it provide any reason that the call priority determiner operates at times other than responsive to failure of the normal communication link. Indeed, claim 7 does not require the call priority determiner be operable other than upon failure, as long as it is operable then. Regardless, this dependent claim does not require the emergency call router to be operable other than when the communication link fails.[4] WSOU points to no such disclosure in the intrinsic

---

[4] WSOU's reliance on *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372 (Fed. Cir. 2018) is inapposite. There, the question was whether the term "Application-Aware Resource Allocator" was required to take into account only information obtained from the application layer 7. Many dependent claims required that network layer 3 or transport layer 4 be taken into

evidence. *See ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 541 (Fed. Cir. 1998) (claim differentiation cannot make independent claim broader than dependent claim where specification did not support broader interpretation).

The portions of the specification that WSOU cites in reply either support Microsoft's proposal when read in context, or are wholly irrelevant. First, 7:41-43 states "[t]he emergency call router 48 is operable to provide selected, rudimentary local call control functionality to the access gateway and the local network associated with the gateway." Reply Br. at 2. This does not contradict Microsoft's construction, and it is part of a discussion that "*[u]pon detection of the communication link failure*, the detector generates an indication, here represented on the line 46, that is provided to an emergency call router." '868 at 7:34. WSOU's citation to 7:44-55 is in the same post-link failure context and describes what the emergency call router enables once it becomes operable. WSOU's argument that higher priority calls are an example of calls that can be completed once the emergency call router becomes operable does not discuss making the priority determiner, much less the emergency call router, operable "not only" responsive to failure of the communication link.

WSOU next points to 7:55-56, but that does not stand for WSOU's desired proposition that "the emergency call router may operate to provide certain call functionality even before failure of the communication link." *Id.* This passage says no such thing:

*Upon detection of the communication link failure, the detector generates an*

---

account, so a construction that required the resource allocator to allocate resources using only information obtained from application layer 7 would render meaningless the dependent claims. *Id.* at 1378. Here, that is fundamentally not the case. Dependent claim 7 of the '868 patent describes circumstances in which the call priority determiner may be active in relation to network conditions, not the emergency call router described in claim 1. It does not describe additional circumstances in which the emergency call router or priority determiner may be operable. And, unlike in *Intellectual Ventures*, the '868 specification never describes the emergency call router as operable other than responsive to failure of the communication link.

> ***indication, here represented on the line 46, that is provided to an emergency call
> router 48.*** … The emergency call router 48 is operable to provide selected,
> rudimentary local call control functionality to the access gateway and the local
> network associated with the gateway. By providing the local call handling
> functionality to the local network, calls placed between telephonic stations of the
> local network are at least selectably completable. ***Selection of which calls are
> completed as well as routing of certain priority calls to designated, local-network
> telephonic stations is dependent, e.g., upon the call-type of the call being placed.***
> Higher-priority calls are permitted to be completed prior to lower-priority calls.
> ***Call-types include, for instance, local calls, long distance calls, e.g., local toll
> calls, intra-state calls, inter-state calls, international calls, toll-free calls, operator
> calls, collect calls, and emergency calls. Upon failure of the communication link,
> many of such calls are no longer able to be completed.***

'868 at 7:34-56. This paragraph comes in the context of the emergency call router becoming

operable "[u]pon detection of the communication link failure" and explains that selecting which

calls will be completed in this emergency situation depends in part on the type of call being

placed. While in normal operation many different call types would be completed, such as the call

types listed at 7:52-55, where the communication link has failed, "many of such calls are no

longer able to be completed." This, too, is consistent with Microsoft's proposed construction and

does not say that the emergency call router provides services during normal communication link

operation. The alternative stand-alone unit embodiment likewise supports that the emergency call

router functions only in the case of normal communication link failure. *See* 9:41-53.

Finally, WSOU cites to 7:57-8:12 to try to argue, again, that the emergency call router is

not limited to use when the communication link has failed. Reply Br. at 3. Once again, WSOU is

wrong. This paragraph follows on from the previous paragraph's discussion of the emergency

call router becoming operable upon detection of communication link failure and discusses details

of the prioritization of calls undertaken by the priority detector/priority determiner 56, referred to

at 7:50-51 ("Higher-priority calls are permitted to be completed prior to lower-priority calls.").

WSOU's argument does not bear scrutiny.

In its responsive brief, Microsoft pointed to the numerous and consistent descriptions in

the specification making clear that the emergency call router of the '868 patent claims is a "back-up call router that is operable only when the communication link fails." Where, as here, *every* description of the emergency call router is a router that becomes operable only in response to failure of the normal communication link, it is proper to construe the term as Microsoft has proposed. *See Trs. of Columbia Univ.*, 811 F.3d at 1364 (citing *Phillips*, 415 F.3d at 1320-21).

D.     **"target gateway" (Claims 1 and 18)**

| Microsoft's Proposed Construction |
| --- |
| gateway coupled to the emergency call router and separate from the access gateway |

There appears to be no dispute that the "target gateway" is a gateway coupled to the emergency call router. And though WSOU's disagreement with Microsoft's proposed construction focuses on whether the access and target gateways much be "physically" separate, the word "physical" does not appear in Microsoft's construction. The point is that the access and target gateways are *separate* gateways.

WSOU's allegation that Microsoft has somehow not explained why its proposed construction is correct because it has not pointed to unambiguous intrinsic evidence is misplaced. Reply Br. at 7. It is no surprise that Microsoft did not cite to any portion of the specification discussing the target gateway. The term is never used in the specification. WSOU also overlooks the prosecution history. As Microsoft has explained, the only mentions of the target gateway in the prosecution history support its proposed construction. Resp. Br. at 11.

The "counterexamples" that WSOU cites simply discuss access gateways or gateways generally. None mentions or describes a target gateway, and none suggests that a target gateway and access gateway are not separate or that they should otherwise be combined or equated. Some of WSOU's citations simply describe exemplary access gateways. *See, e.g.,* 5:55-57; 5:51-55. Others explicitly describe access gateways, and to the extent other gateways are discussed, there

7

is no indication that those "other gateways" are target gateways. *See, e.g.,* 6:3-8. If anything, the passage at 6:3-8 supports Microsoft's construction because the "other" target gateway would be separate from the access gateway 16-4. And, just because the access gateway is described as sometimes embodying the emergency call router (and not all "other claimed components" as WSOU claims), that does not mean that the (unmentioned) target gateway and the access gateway are the same gateway. *See id.* at 7:37-39.

Finally, the claims themselves require the target gateway to be separate from the access gateway. Claim 18 requires the emergency call router to be connected between an access gateway and a target gateway, and allowing the two gateways to be the same would render the claim nonsensical. '868 at 12:31-33. Similarly, claim 1 recites the separate and distinctly named "access gateway" and "target gateway," creating an implication that they are separate and distinct. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (citing *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)) ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention."); *see also*, *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404–05 (Fed. Cir. 1996). Further, absent clear intent otherwise, where the claims of a patent use the same terminology across multiple claims, the terms should be given the same meaning across claims. *In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2016). There is no such clear intent, and no reason that the target gateway in claim 1 would not mean the exact same thing as the target gateway in claim 18.

### E.    "selectably operable" (Claims 1 and 13) and "selectably routing" (Claim 18)

| Microsoft's Proposed Construction |
| --- |
| selectably operable: deciding whether to permit a call to be routed based on call-type or call priority |

selectably routing: deciding whether to permit a call to be routed based on call-type or call priority

In reply, WSOU states, for the first time, that the term "selectably" as used in "selectably operable" and "selectably routing" "simply reflects that the routing operation is not performed unless at least 'the emergency call router determines [that] the call request is for a call of the first selected call-type.'" Reply Br. at 8; *see id.* at 9 ("it simply reflects that the routing operating is not performed unless it is at least determined that 'the call request is for a call of the selected call-type.'"). Microsoft agrees. The proper construction of these terms should reflect that a determination must be made by the emergency call router that a call request is for a call of a selected call-type before the call can be routed.

To be complete, however, the construction also ought to include that call priority is taken into consideration in the determination of whether to permit a call to be routed, as that goes to the object of the '868. The specification says so, everywhere it describes the decision of whether to route a call. *See, e.g.*, '868 at 4:31-52; 7:47-51; 7:61-8:12; 8:23-27; 8:46-52; 9:26-33.

**F.**   **"the apparatus of claim 1 wherein the communication system further comprises a local-network alternate station, wherein said emergency call muter is further for determining whether the call of the selected call-type shall be completable by way of the normal-operation communication link and for rerouting a call request to the local-network alternate station upon determination that the call completion by way of the normal-operation communication link" (Claim 12)**

| Microsoft's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| Indefinite | Plain and ordinary meaning; not indefinite. |

There is no rule that expert testimony is required to find, as a matter of law, that a claim is indefinite, especially if the claim is nonsensical on its face. *See Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017) (citing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015) ("Moreover, '[a] party cannot transform into a factual

9

matter the internal coherence and context assessment of the patent simply by having an expert

offer an opinion on it. The internal coherence and context assessment of the patent, and whether

it conveys claim meaning with reasonable certainty, are questions of law.'"); s*ee also Enzo*

*Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010).

Here, claim 12 is clearly missing words. The patent was not corrected after issuance. The

end result is that the claim is indefinite. *See Trusted Knight Corp. v. Int'l Bus. Machs. Corp.*, 681

F. App'x 898, 904 (Fed. Cir. 2017) (holding that claim limitation missing words was indefinite

where the claim was subject to reasonable debate regarding which of the more than one possible

corrections provided the proper scope.). Parsing the claim exposes the problem:

- The apparatus of claim 1 wherein the communication system further comprises a
  local-network alternate station,

- Wherein said emergency call [router] is further

  o For determining whether the call of the selected call-type shall be completable
    by way of the normal-operation communication link

  o And for rerouting a call request to the local-network alternate station

    ▪ Upon determination that the call completion by way of the normal-
      operation communication link …

The claim simply trails off, and there is no way to know definitively how the claim was intended

to end. Microsoft, and the jury, should not be made to guess at what that intent was or what the

scope of the claim is. The claim should be found to be indefinite based on this alone.

WSOU's speculative rewriting of the claim reinforces the indefiniteness issue. In

presenting a so-called alternative construction, WSOU rewrites the claim entirely without

pointing to any support for why that interpretation of the claim is the only reasonable one. WSOU has tacitly admitted that the claim as drafted is not understandable.

Finally, even assuming for the sake of argument that the claim can or should be rewritten, WSOU's interpretation of the claim differs from Microsoft's best guess as to what the claim was intended to mean. Microsoft's best guess is that it was meant to say "the apparatus of claim 1 wherein the communication system further comprises a local-network alternate station, wherein said emergency call muter is further for determining whether the call of the selected call-type shall be completable by way of the normal-operation communication link and for rerouting a call request to the local-network alternate station upon determination that the call completion by way of the normal-operation communication link **has failed**." This is different from WSOU's proposed rewrite. Reply Br. at 10. Where conflicting but potentially equally valid interpretations of a claim are possible, it is indefinite. See *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014)) ("Notably, a claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'"); s*ee also*, *Trusted Knight*, 681 F. App'x at 904.

## III.   THE '550 CLAIM TERMS

### A.   Means Terms

WSOU's efforts to overcome the strong presumption that 112(6) applies to the "means for" elements fail as a matter of law and on the facts across all the disputed claim elements. *Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1366 (Fed. Cir. 2008). Overcoming that presumption requires a preponderance of the evidence. *Apex Inc. v. Raritan Comp., Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003). WSOU first relies on cases with very different claims. Unlike in *TecSec, Inc. v. Int'l Bus. Machs. Corp*., 731 F.3d 1336 (Fed. Cir. 2013) or *TriMed, Inc. v.*

*Stryker Corp.,* 514 F.3d 1256 (Fed. Cir. 2008), these claims recite a multiple access presence agent with ten different means for performing ten different, specific functions. WSOU makes no attempt to show that a "multiple access presence agent for use in a presence server" is a device known to perform a single function, let alone all the claimed functions; even WSOU's citations to the specification show that it is not. For example, referring to an "agent"—a programmed black box—provides no indication of structure. Adding "multiple access presence" does no more. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350-51 (Fed. Cir. 2015).

WSOU's efforts to avoid the need for a disclosed algorithm as part of the corresponding structure also fail. Where, as here, a programmed computer (rather than a circuit or other hardware) implements the function, the disclosed structure, which must be linked to the function at issue, *must* include an algorithm describing how the function is accomplished. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The phrase "multiple access presence agent for use in a presence server" in the preamble provides no algorithm, much less one that accomplishes all of the recited functions.

WSOU's reliance on the preamble (Reply Br. at 12) both to avoid application of 112(6) and the need to identify a disclosed and linked algorithm borders on the frivolous. Its cited specification support identifying the presence server and agent as "physical" distinguishes neither from any other programmed device or computer.[5] *See Sony Corp. v. Iancu*, 924 F.3d 1235, 1240 (Fed. Cir. 2019) (construing "reproducing means" as computer-implemented *despite* hardware also being disclosed, where no circuitry for performing the claimed function was disclosed). WSOU supplies no proof that a presence server with a presence agent is known

---

[5] "[T]he presence server is a special purpose "physical entity" that, along with the multiple access present agent, operates to specifically perform the recited functions." *Id*.

hardware for performing any function. The '550 patent discloses no specialized circuitry, and certainly not all that would be required for performing all of the different claimed functions.

WSOU's broad reliance on *Nevro Corp. v. Boston Scientific Corp.* is similarly misplaced. There, "means for generating" needed no algorithm because the corresponding, linked structure in the specification was "a signal or pulse generator, not a general-purpose computer or processor." 955 F.3d 35, 43 (Fed. Cir. 2020). Further, the specification taught "how to configure the signal generators to generate and deliver the claimed signals." *Id*. *Nevro* does not overrule *WMS Gaming*'s holding that the disclosed structure for computer-implemented functions is "the special purpose computer programmed to perform the disclosed algorithm." 184 F.3d at 1349. At best, the '550 patent describes generic servers that are somehow programmed to perform the specific claimed functions. *See Verizon Servs. Corp. v. Vonage Holdings Corp*., 503 F.3d 1295, 1303 (Fed. Cir. 2007) (endorsing "server" as "a computer system, such as one or more computers and/or devices, that provides services to other computer systems over a network."). At bottom, "the corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *WMS Gaming*, 184 F.3d at 1348 ("[t]he ***instructions of the software program*** that carry out the algorithm electrically ***change the general purpose computer*** by creating electrical paths within the device. These electrical paths ***create a special purpose machine*** for carrying out the particular algorithm."); *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech*., 521 F.3d 1328, 1333 (Fed. Cir. 2008).

WSOU's inability to identify specialized devices or circuitry is hardly surprising. The specification describes the claimed presence server and presence agent as computers, which must be programmed to perform any function, and that each of the recited functions of the "means" claim terms is computer-implemented. For example, it describes the presence server:

> The presence server 160 is a physical entity that **can operate as either the PA 150 or as a proxy server** for routing requests from watchers 170 to the PA 150. The **presence server 160 stores** the presence information 180 for a plurality of presentities 110. Thus, the PA 150, in combination with the presence server 160, **is operable to receive** presence information of the presentity 110 from the PU As 140, receive requests 40 from watchers 170 for the presence information and provide the presence information to the watcher(s) 170.

'550 at 4:33-41. Each of the Presence Agent's described functions—aggregating, maintaining, storing, receiving, and providing information via a communication network (*id.* at 4:12-25)— is a generic computer activity, but how each is performed depends on how the computer has been programmed. The specification further confirms that, like the software-based presence user agents (PUAs)[6] that WSOU tries to distinguish (Reply Br. at 12), the presence server with presence agent is computer-implemented software when it states that "[w]hen acting as a PA 150, the presence server 160 **can also be co-located with a PUA 140.**" '550 at 4:41-43.

WSOU elevates literal form over substance, contrary to the '550 patent specification, in its universal effort to avoid identifying a disclosed and linked algorithm because, allegedly, "neither the claims or Defendant's own (improper) proposed structure recite a general-purpose computer or processor." Reply Br. at 13-14, 16-24. As discussed above, the presence server and multiple access presence agent are described as computers that *must* be programmed to perform the claimed computer-implemented functions, and the claims require each means element to be part of them. Thus, disclosure of an algorithm is required.

WSOU's efforts to point to restatements of the claimed functions as the needed algorithm also fail in each instance. The corresponding structure must include an algorithm that is more than a restatement of the claimed function. *See WMS Gaming*, 184 F.3d at 1349; *Augme Techs.,*

---

[6] Presence user agents (PUAs) are "**applications (e.g., software programs) running on one or more physical communication devices**, such as a user-operated terminal 120c, a computer network server, a telephony server (e.g., a circuit switch, IP router, gateway, etc.), a web server or any other networked device (e.g., printer, fax machine, etc.)." 3:41-46.

*Inc. v. Yahoo! Inc.,* 755 F.3d 1326, 1337 (Fed. Cir. 2014). The disclosed and linked algorithm must show *how* (*i.e.*, step-by-step) the claimed function is performed. *See Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) (however an algorithm is expressed, it must be a "step-by-step procedure for accomplishing a given result") (citation omitted); *see also*, *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382-85 (Fed. Cir. 2009) (a description that merely recites the function without describing how it is achieved, does not provide sufficient "structure"). The '550 patent offers merely a black box said to perform the recited function or some equivalently rephrased statement of that function. This is insufficient to disclose the algorithm and thus renders indefinite each claim with a means-plus-function term discussed below. *See Augme Techs*, 755 F.3d at 1338 (disclosing inputs to and outputs from "code assembler instructions" does not disclose an algorithm for how the claimed assembly function is performed); s*ee also Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*, 809 F. App'x 863, 865 (Fed. Cir. 2020) (restating the claimed function or "describing the results of an unspecified algorithm in this manner, however, is not sufficient to satisfy the requirements of § 112 ¶ 6.").

Further, WSOU misreads its own cited cases and ignores relevant Federal Circuit law in arguing, based on *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376 (Fed. Cir. 2011), that the terms should not be found indefinite because a person of skill in the field could create an operative software program for the specified function. Reply Br. at 14-18, 20-22, 24. Post-*Typhoon Touch*, the Federal Circuit reaffirmed the long-standing principle that "[a] patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function. To allow that form of claiming under section 112, paragraph 6, would allow the patentee to claim all possible means of achieving a function." *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir.

2013); *see also*, *Williamson v. Citrix Online*, 792 F.3d 1339, 1351 (Fed. Cir. 2015) (*en banc*) ("the fact that one of skill in the art could program a computer to perform the recited functions cannot create structure where none otherwise is disclosed").

Indeed, in *Typhoon Touch*, the Federal Circuit addressed sufficient disclosure of an algorithm for a "means for cross-referencing." *Typhoon Touch*, 659 F.3d at 1383-86. The court found sufficient disclosure of the requisite algorithm for the cross-referencing function in the prose description as to how the function was to be implemented. *Id.* at 1386 (noting that "[t]he patent recites that '[c]ross-referencing entails the matching of entered responses with a library of possible responses, and, if a match is encountered, displaying the fact of the match, otherwise alerting the user, or displaying information stored in memory fields associated with that library entry.' It is not disputed that the steps are carried out by known computer-implement operations, and are readily implemented by persons of skill in computer programming….") (citations omitted). WSOU identifies no such step-by-step prose recital, or anything equivalent, in the '550 patent. Indeed, none exists. By failing to disclose the corresponding algorithm for the computer-implemented means-plus-function terms, each of the means terms renders the associated claim indefinite. *Ergo Licensing,* 673 F.3d at 1363.

Rather than repeating the global issues addressed above, which apply equally to each disputed term, the following sections address only issues unique to specific claim elements.

1.  means for defining access rules for each of said presence contributors, said access rules associated with each of said presence contributors defining respective rights and privileges of said presence contributors to access said presence information of said presentity after said presence contributors have provided said presence information to said presence server (Claim 1)

WSOU's efforts to identify an algorithm by restating the recited function of "defining

access rules for each of said presence contributors"[7] fails initially as a matter of law. Replacing the claim phrase "access rules for each of said presence contributors" with a description of what an access rule is only demonstrates the absence of any steps for performing the claimed function. *See Augme Techs*, 755 F.3d at 1337; *see also*, *Triton Tech of Texas, LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1379 (Fed. Cir. 2014); *Noah Sys., Inc. v. Intuit Inc*., 675 F.3d 1302, 1317 (Fed. Cir. 2012); *Finisar Corp. v. DirecTV Grp., Inc*., 523 F.3d 1323, 1340 (Fed. Cir. 2008).

Moreover, WSOU's specification string cites all fail to disclose any algorithm, as each of those cites describe only what an access rule may be, without any sort of step-by-step process for "defining access rules for each of said presence contributors." *See, e.g*., 1:60-64; 5:62-6:1; 6:65-7:3; 7:38-41; 7:65-8:5; 8:36-39; *see Advanced Ground Info. Sys., Inc. v. Life360, Inc*., 830 F.3d 1341, 1349 (Fed. Cir. 2016) (disclosure of information about a "symbol" did not disclose "an algorithm or description as to how those symbols are actually generated.") (internal quotations omitted). Figures 3 and 4 similarly provide no details regarding how access rules are "defined" beyond the bare statements "establish access rules for presence contributor." *See In re Aoyama*, 656 F.3d 1293, 1298 (Fed. Cir. 2011) (rejecting reliance on a flow chart when the figure "fails to describe, even at a high level, how a computer could be programmed to produce the structure that provides the results described in the boxes."). Unlike the disclosure in *Typhoon Touch*, as discussed above, the specification of the '550 patent does not provide any disclosure describing how to perform the function of "***defining*** access rules for each of said presence contributors."

>    2.   <u>means for authenticating one of said presence contributors to determine said access rules associated with said one of said presence contributors (Claim 1)</u>

---

[7] Microsoft disagrees with the completeness of the structure and function proposed by WSOU because it fails to include presentity 110 or identify the required software algorithm. *See* Resp. Br. at 20. The claim is indefinite because the '550 patent fails to disclose the necessary algorithm for performing the recited function under either party's rendition of the function.

WSOU's attempt to identify and articulate an algorithm for this element as a restatement of the claimed function fails for the same reasons described above. Further, WSOU's identified support for its stated algorithm provides no more than the legally insufficient description of the inputs or the results of the claimed function. *See Augme Techs*, 755 F.3d at 1338 (disclosing inputs to and outputs from "code assembler instructions" does not disclose an algorithm for how the claimed assembly function is performed); s*ee also*, *Uniloc USA,* 809 F. App'x at 865 (restating the claimed function or "describing the results of an unspecified algorithm in this manner, however, is not sufficient to satisfy the requirements of § 112 ¶ 6."). WSOU's specification string cites just describe authentication credentials as a "user name and password" and the resulting impacts of success or failure to authenticate, as "[u]pon valid authentication, users have full access rights to the presence information of the presentity." Reply Br. at 15; 1:33-34. These are only generic statements that the presence agent uses authentication credentials to authenticate the presence contributor. *See, e.g.*, 1:32-34, 2:21-26, 6:44-53, 7:4-12, 7:42-47, 8:5-22, Fig. 5. WSOU points to nothing that explains *how* to carry out "authenticating one of said presence contributors to determine said access rules associated with said one of said presence contributors" as required by the function.

Unlike in *Typhoon Touch*, the specification provides no disclosure of the steps required to perform the recited function. At most, as shown by WSOU's citations, the specification describes authentication credentials and the results of success or failure to authenticate. These important details are absent from the specification, which uses phrases like "[u]pon valid authentication" (1:33), "[t]he access rules 210 further include authentication credentials associated with each presence contributor 120 that are used by the multiple access presence agents 150a and 150b to authenticate the presence contributors 120" (6:44-47), "[f]rom the authentication credentials, at

18

350, the presence agent 150 authenticates" (7:9-10), and "the multiple access presence agent uses the received authentication credentials to authenticate the presence contributor" (8:10-12). None of this rises to the level of detail provided in *Typhoon Touch*.

> **3.** <u>means for enabling access to said presence information of said presentity by said one of said presence contributors based on said access rules associated with said one of said presence contributors (Claim 1)</u>

WSOU's effort to identify any disclosed algorithm and link it to the claimed function of this element again amounts to nothing more than providing a legally insufficient restatement of the claimed function.[8] The ensuing specification citations merely describe what an access rule may be, and that presence contributors are authenticated before the presence contributor may access the presence information of the presentity. Reply Br. at 16. This discloses nothing about *how* the system is programmed to enable access to presence information of a presentity by one of the presence contributors based on the access rules and thus does not provide the step-by-step disclosure required for an algorithm. *See Noah Sys.*, 675 F.3d at 1314 (holding that disclosures relating to how passcodes are issued to authorized agents, how the system prevents entries to the master ledger from being processed unless the passcode is verified, and that a valid passcode is required before the agent's order to enter, delete, review, adjust, or process the data inputs in the master ledger will be recognized by the system, did not provide sufficient disclosure of the algorithm for an "access means.").

Critically, the claimed function in this element is central to the concept of the patent. The '550 patent urged that because the prior art lacked the ability to enable others to access only certain portions of the presence information, "what is needed is a multiple access presence agent

---

[8] Microsoft disagrees with the completeness of the structure proposed by WSOU because it fails to include presence user agent 140, communications network 130 and the necessary programming. *See* Resp. Br. at 23. Regardless, the claim is indefinite because the patent fails to disclose an algorithm that must be part of the structure for performing the recited function.

capable of providing different access privileges to different users." 1:32-51. When determining if

an algorithm has been sufficiently disclosed, "the amount of detail that must be included in the

specification depends on the subject matter that is described and its role in the invention as a

whole, in view of the existing knowledge in the field of the invention." *Typhoon Touch*, 659 F.3d

1376 at 1385. Thus, the function of "enabling access ..." requires a significant corresponding

disclosure of the algorithm. WSOU's cited portions provide at most generic statements as to the

result to be achieved. *See, e.g.*, 1:63-2:2, 7:9-30, 7:61-8:7, 8:8-22, Figs. 3, 5. None of these cited

disclosures rises even to the level of detail provided in *Typhoon Touch*. 659 F.3d at 1386.

    **4.**    <u>means for enabling access further includes means for filtering said
presence information of said presentity based on said access rules of said
one of said presence contributors to produce filtered presence information
and means for providing said filtered presence information to said one of
said presence contributors (Claim 1)</u>

In addition to the global errors in its arguments described above, WSOU's efforts to

identify any relevant disclosure as to how the claimed functions for this element are

accomplished are not supported by its subsequent citations to the specification.[9] The cited

portions of the specification for both functions, and WSOU's argument that "[a]s the

specification teaches in an exemplary embodiment, the access rules may include filters that

operate to only allow a portion of the presence information to be provided to a presence

contributor, such as in the case where access rule A may allow an assistant to have access/view

to professional contacts of a manager but not the personal contacts on the manager's buddy list"

(Reply Br. at 17), disclose nothing about how the system is programmed to accomplish either

function. At best, the disclosure pointed to by WSOU "describes an outcome, not a means for

---

[9] Microsoft disagrees with the completeness of the structure proposed by WSOU because it fails
to include presence user agent 140, communications network 130 or 135 and the necessary
programming. *See* Resp. Br. at 27. Regardless, the claim is indefinite as the '550 patent fails to
disclose algorithms that must be part of the structure for performing the two recited functions.

achieving that outcome." *See Blackboard*, 574 F.3d at 1384  (citing *Aristocrat*, 521 F.3d at 1334)

(holding that description of an outcome is not a sufficient disclosure of an algorithm); *Augme*

*Techs*, 755 F.3d at 1338; s*ee also*, *Uniloc USA*, 809 F. App'x at 865.

> **5.**    means for enabling access further includes means for enabling said one of
> said presence contributors to update said presence information of said
> presentity based on said access rules of said one of said presence
> contributors (Claim 1)

In addition to the global errors described above, WSOU's efforts to identify any relevant

disclosure as to how the claimed functions for this element are accomplished are not supported

by its own citations.[10] At best, it describes what an access rule may be and argues that those rules

can be used by the presence agent as required in this claim element. Reply Br. at 19. This offers

only a legally insufficient restatement of the claimed function as the required algorithm. But

even WSOU's argument discloses nothing about how the system is programmed to enable one of

presence contributors to update presence information of a presentity based on the access rules, as

required by the claim term. The portions of the specification that WSOU cites do no more than

identify the black box in which the function of updating presence information is performed.

"This type of purely functional language, which simply restates the function associated with the

means-plus-function limitation, is insufficient to provide the required corresponding structure."

*See Noah Sys.*, 675 F.3d at 1314-17.

Indeed, those portions reveal that the specification merely discloses the general idea that

access rules may "define the scope and/or ability of the presence contributor 120 to set/change

the presence information 180 of the presentity." 6:12-14; *see also*, 5:48-6:1; 7:65-8:4. The

---

[10] Microsoft disagrees with the completeness of the structure proposed by WSOU, which fails to
include presence contributors 120, access rules 210, presence user agent 140, communications
network 130 and the necessary programming. *See* Resp. Br. at 29-30. Regardless, the claim is
indefinite because the patent fails to disclose an algorithm that must be part of the structure for
performing the recited function.

specification does not describe how this is done. *See* 7:54-60; *see also*, 7:13-30. But generic restatements of the claimed function are not sufficient to disclose an algorithm. *See Augme Techs*, 755 F.3d at 1337. None of the disclosures cited by WSOU provides any details regarding the steps performed to "enable said presence contributors to update said presence information."

> **6.** <u>means for enabling access further includes means for enabling said one of said presence contributors to define preference information associated with said presence information of said presentity based on said access rules of said one of said presence contributors (Claim 1)</u>

In addition to the global errors in its arguments described above, the generic statements WSOU cites as identifying a linked algorithm for this claim element simply describe the claimed function, disclosing nothing about how the system is programmed to enable one of the presence contributors to define preference information of a presentity based on the access rules. [11] As before, at best this identifies the black box in which the claimed function is performed. WSOU's proposed algorithm, "which simply restates the function associated with the means-plus-function limitation, is insufficient to provide the required corresponding structure." *See Noah Sys.*, 675 F.3d at 1314-17.

Furthermore, WSOU's cites confirm that the specification only discloses the general idea that access rules may "restrict access" (5:48-52) or "define the scope and/or ability of the presence contributor 120 to set/change preference information for the presentity" (6:23-25), and that the "multiple access presence agent grants the presence contributor the rights and privileges associated with the access rules for that presence contributor" (8:20-22). The specification provides no description of how this is done. Generic restatements of the claimed function are not

---

[11] Microsoft disagrees with the completeness of the structure proposed by WSOU in its opening brief because it fails to include access rules 210, presence user agent 140, communications network 130 and the necessary programming. *See* Resp. Br. at 31-33. Regardless of the necessity for additional components, the claim is indefinite because the '550 patent fails to disclose an algorithm that must be part of the structure for performing the recited function.

sufficient. *See Augme Techs*, 755 F.3d at 1337. None of the disclosures cited by WSOU provides any details regarding the steps performed to "enabl[e] said one of said presence contributors to define preference information associated with said presence information of said presentity based on said access rules of said one of said presence contributors."

      7.    <u>means for authenticating further includes means for assigning authentication credentials to each of said presence contributors and means for receiving said authentication credentials of said one of said presence contributors to authenticate said one of said presence contributors (Claim 4)</u>

In addition to the global errors in its arguments described above,[12] further fails to identify any algorithm specific to the functions recited in this claim element.  At best, WSOU cites to portions of the specification that describe what may constitute authentication credentials, such as a "user name and password," when authentication credentials are used (*see* 7:42-47; 6:44-57; 7:4-12), and the resulting impacts of success or failure to authenticate. 8:5-22. These cites say nothing about the "assigning" function. As to the operation of the required function, WSOU cites only to a near-verbatim recitation of the claimed function. *See* 2:21-23 ("the multiple access presence agent assigns authentication credentials to each of the presence contributors"). But generic restatements of the claimed function are not sufficient to disclose an algorithm. *See Augme Techs*, 755 F.3d at 1337. Finally, the flow chart cited by WSOU at best provides a box 520 which merely restates the claimed function, and at worst, fails to even identify the function of "assigning authentication credentials to each of said presence contributors." *See In re Aoyama*, 656 F.3d 1293, 1298 (Fed. Cir. 2011) (rejection reliance on a flow chart, when the figure "fails to describe, even at a high level, how a computer could be programmed to produce the structure

---

[12] Microsoft disagrees with the completeness of the structures proposed by WSOU because it fails to include presence contributors 120, presence user agent 140, and communications network 130 or 135. *See* Response Br. at 36-37. Regardless, the claim is indefinite because the patent fails to disclose algorithms that must be part of the structures for performing the recited functions.

that provides the results described in the boxes"). None of the cited disclosures provides any details regarding the steps performed to accomplish the required function.

As to the second stated function, WSOU seeks to invoke the so-called *Katz* exception based on use of the term "receiving," seeking to obviate any need for an algorithm. Reply Br. at 23. As Microsoft has explained, the *Katz* exception is inapplicable here. Resp. Br. at 37-38. "It is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed." *Ergo Licensing*, 673 F.3d at 1365. The exception only applies where the function requires no more than "processing," "receiving," or "storing" such that any general-purpose computer may perform the function without any special programming. *Id*. Where, as here, the function requires more than merely receiving, the *Katz* exception does not apply. *Id*. WSOU makes no other effort to identify the required algorithm for this second function. The claim is indefinite.

> **8.** means for enabling further includes means for enabling access to said presence information of said presentity by multiple ones of said presence contributors simultaneously based on said respective access rules associated with said multiple ones of said presence contributors (Claim 6)

In addition to the global errors in its arguments,[13] WSOU identifies no more than portions of the specification disclosing the general idea of this claimed function. For example, it observes that access rules may "restrict access" (5:48-52) or "define the scope and/or ability of the presence contributor 120 to set/change preference information for the presentity" (6:23-25), and that the "multiple access presence agent grants the presence contributor the rights and privileges associated with the access rules for that presence contributor" (8:20-22). But restating

---

[13] Microsoft disagrees with the completeness of the structure proposed by WSOU because it fails to include presence user agents 140, and communications network 130. *See* Resp. Br. at 39. Regardless, the claim is indefinite because the patent fails to disclose an algorithm that must be part of the structure for performing the recited function.

the claimed function discloses nothing about how the system is programmed to enable multiple presence contributors to simultaneously access the presence information and does not provide the required algorithm. *See Augme Techs*, 755 F.3d at 1337; *see also, Ergo Licensing,* 673 F.3d at 1365 (holding that however an algorithm is expressed, it must be a "step-by-step procedure for accomplishing a given result" (citation omitted)).

**B.     "presentity" / "presentities" (Claims 1, 8 and 11) and "presence contributor" (Claims 1, 8, and 11)**

| Microsoft's Proposed Constructions |
|---|
| Presentity: the entity whose presence is being represented |
| Presence contributor: an entity that provides presence information about a presentity to a presence server or presence agent |

Microsoft explained the distinct roles that the '550 ascribes to "presentities" and "presence contributors," after WSOU originally argued that both have the same role. Resp. Br. at 40-42; *see* Op. Br. at 33-34. The patent specification is clear, and it supports Microsoft's proposed constructions. However, WSOU seeks to create ambiguity while doing nothing to explain what it, or a person of ordinary skill in the art, understands these terms to mean.

"Presentity" and "presence contributor" are key terms in the asserted claims and the patent but are coined terms that are not commonly understood. Just because there are circumstances in which a presentity might also be able to provide presence information does not make the terms synonymous. Microsoft's proposed constructions do not require a presentity and a presence contributor to always be separate entities, but they do recognize that the two terms, which are critical to understanding the solution of the '550 patent, have separate roles.

DATED: February 24, 2021       By:   */s/ Irene Yang*_____

Barry K. Shelton
Texas State Bar No. 24055029
SHELTON COBURN LLP
311 RR 620 S, Suite 205
Austin, TX 78734
Telephone: (512) 263-2165
Fax: (512) 263-2166
bshelton@sheltoncoburn.com

*Of Counsel*

Michael J. Bettinger
Irene Yang
SIDLEY AUSTIN LLP
555 California St., Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Fax: (415) 772-7400
mbettinger@sidley.com
irene.yang@sidley.com

Richard A. Cederoth
John W. McBride
SIDLEY AUSTIN LLP
1 South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Fax: (312) 853-7036
rcederoth@sidley.com
jwmcbride@sidley.com

*Attorneys for Defendant Microsoft Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 24, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record as identified below.

*/s/ Irene Yang*
Irene Yang
